(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HAYWOOD *v.* DROWN ET AL.

### CERTIORARI TO THE COURT OF APPEALS OF NEW YORK

No. 07–10374.   Argued December 3, 2008—Decided May 26, 2009

Believing that damages suits filed by prisoners against state correction officers were largely frivolous and vexatious, New York passed Correction Law §24, which divested state courts of general jurisdiction of their jurisdiction over such suits, including those filed under 42 U. S. C. §1983, and replaced those claims with the State's preferred alternative. Thereunder, a prisoner will have his claim against a correction officer dismissed for want of jurisdiction and will be left to pursue a damages claim against the State in the Court of Claims, a court of limited jurisdiction in which the prisoner will not be entitled to attorney's fees, punitive damages, or injunctive relief. Petitioner filed two §1983 damages actions against correction employees in state court. Finding that it lacked jurisdiction under Correction Law §24, the trial court dismissed the actions. Affirming, the State Court of Appeals rejected petitioner's claim that the state statute's jurisdictional limitation violated the Supremacy Clause. It reasoned that because that law treats state and federal damages actions against correction officers equally—*i.e.,* neither can be brought in New York courts—it was a neutral rule of judicial administration and thus a valid excuse for the State's refusal to entertain the federal cause of action.

*Held:* Correction Law §24, as applied to §1983 claims, violates the Supremacy Clause. Pp. 5–13.

(a) Federal and state law "together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are . . . courts of the same country, having jurisdiction partly different and partly concurrent." *Claflin* v. *Houseman*, 93 U. S. 130, 136–137. Both state and federal courts have jurisdiction over §1983 suits. So strong is the presumption of concurrency that it is defeated only when Congress expressly ousts

state courts of jurisdiction, see *e.g., id.,* at 136; or "[w]hen a state court refuses jurisdiction because of a neutral state rule regarding the administration of the courts," *Howlett* v. *Rose*, 496 U. S. 356, 372. As to whether a state law qualifies as such a neutral rule, States retain substantial leeway to establish the contours of their judicial systems, but lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies. Whatever its merits, New York's policy of shielding correction officers from liability when sued for damages arising out of conduct performed in the scope of their employment is contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages. "A State may not . . . relieve congestion in its courts by declaring a whole category of federal claims to be frivolous." *Id.,* at 380. Pp. 5–8.

   (b) The New York Court of Appeals' holding was based on the misunderstanding that Correction Law §24's equal treatment of federal and state claims would guarantee that the statute would pass constitutional muster. Although the absence of discrimination is essential to this Court's finding a state law neutral, nondiscrimination alone is not sufficient to guarantee that a state law will be deemed neutral. In addition to this misplaced reliance on equality, respondents mistakenly treat this case as implicating the "great latitude [States enjoy] to establish the structure and jurisdiction of their own courts." *Howlett*, 496 U. S., at 372. However, this Court need not decide whether Congress can compel a State to offer a forum, otherwise unavailable under state law, to hear §1983 suits, because New York has courts of general jurisdiction that routinely sit to hear analogous §1983 actions. Pp. 8–13.

9 N. Y. 3d 481, 881 N. E. 2d 180, reversed and remanded.

   STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and ALITO, JJ., joined as to Part III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–10374

## KEITH HAYWOOD, PETITIONER *v.* CURTIS DROWN ET AL.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF NEW YORK

[May 26, 2009]

JUSTICE STEVENS delivered the opinion of the Court.

In our federal system of government, state as well as federal courts have jurisdiction over suits brought pursuant to 42 U. S. C. §1983, the statute that creates a remedy for violations of federal rights committed by persons acting under color of state law.[1] While that rule is generally applicable to New York's supreme courts—the State's trial courts of general jurisdiction—New York's Correction Law §24 divests those courts of jurisdiction over §1983 suits that seek money damages from correction officers. New York thus prohibits the trial courts that generally exercise jurisdiction over §1983 suits brought against other state officials from hearing virtually all such suits brought

---

[1] Section 1 of the Civil Rights Act of 1871, Rev. Stat. §1979, as amended, 42 U. S. C. §1983, provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

against state correction officers.  The question presented is
whether that exceptional treatment of a limited category of
§1983 claims is consistent with the Supremacy Clause of
the United States Constitution.[2]

I

Petitioner, an inmate in New York's Attica Correctional
Facility, commenced two §1983 actions against several
correction employees alleging that they violated his civil
rights in connection with three prisoner disciplinary pro-
ceedings and an altercation.  Proceeding *pro se*, petitioner
filed his claims in State Supreme Court and sought puni-
tive damages and attorney's fees.  The trial court dis-
missed the actions on the ground that, under N. Y. Cor-
rect. Law Ann. §24 (West 1987) (hereinafter Correction
Law §24), it lacked jurisdiction to entertain any suit aris-
ing under state or federal law seeking money damages
from correction officers for actions taken in the scope of
their employment.  The intermediate appellate court
summarily affirmed the trial court.  35 App. Div. 3d 1290,
826 N. Y. S. 2d 542 (2006).

The New York Court of Appeals, by a 4-to-3 vote, also
affirmed the dismissal of petitioner's damages action.  The
Court of Appeals rejected petitioner's argument that Cor-
rection Law §24's jurisdictional limitation interfered with
§1983 and therefore ran afoul of the Supremacy Clause of
the United States Constitution.  The majority reasoned
that, because Correction Law §24 treats state and federal
damages actions against correction officers equally (that

_____

[2] The Supremacy Clause, Art. VI, cl. 2, provides:

"This Constitution, and the Laws of the United States which shall be
made in Pursuance thereof; and all Treaties made, or which shall be
made, under the Authority of the United States, shall be the supreme
Law of the Land; and the Judges in every State shall be bound thereby,
any Thing in the Constitution or Laws of any State to the Contrary
notwithstanding."

is, neither can be brought in New York courts), the statute should be properly characterized as a "neutral state rule regarding the administration of the courts" and therefore a "valid excuse" for the State's refusal to entertain the federal cause of action. 9 N. Y. 3d 481, 487, 881 N. E. 2d 180, 183, 184 (2007) (quoting *Howlett* v. *Rose*, 496 U. S. 356, 369, 372 (1990) (internal quotation marks omitted)). The majority understood our Supremacy Clause precedents to set forth the general rule that so long as a State does not refuse to hear a federal claim for the "sole reason that the cause of action arises under federal law," its withdrawal of jurisdiction will be deemed constitutional. 9 N. Y. 3d, at 488, 881 N. E. 2d, at 184. So read, discrimination *vel non* is the focal point of Supremacy Clause analysis.

In dissent, Judge Jones argued that Correction Law §24 is not a neutral rule of judicial administration. Noting that the State's trial courts handle all other §1983 damages actions, he concluded that the State had created courts of competent jurisdiction to entertain §1983 suits. In his view, "once a state opens its courts to hear section 1983 actions, it may not selectively exclude section 1983 actions by denominating state policies as jurisdictional." *Id.*, at 497, 881 N. E. 2d, at 191.

Recognizing the importance of the question decided by the New York Court of Appeals, we granted certiorari. 554 U. S. ___ (2008). We now reverse.

II

Motivated by the belief that damages suits filed by prisoners against state correction officers were by and large frivolous and vexatious, New York passed Correction Law §24.[3] The statute employs a two-step process to strip

—————

[3] The New York Attorney General described Correction Law §24 as "further[ing] New York's legitimate interest in minimizing the disruptive effect of prisoner damages claims against correction employees,

its courts of jurisdiction over such damages claims and to replace those claims with the State's preferred alternative. The provision states in full:

> "1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of the duties by such officer or employee.
>
> "2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state."

Thus, under this scheme, a prisoner seeking damages from a correction officer will have his claim dismissed for want of jurisdiction and will be left, instead, to pursue a claim for damages against an entirely different party (the State) in the Court of Claims—a court of limited jurisdiction.[4] See N. Y. Const., Art. VI, §9; N. Y. Ct. Clms. Law Ann. §9 (West 1989) (hereinafter Court of Claims Act).

For prisoners seeking redress, pursuing the Court of Claims alternative comes with strict conditions. In addi-

———————

many of which are frivolous and vexatious." Brief in Opposition 10; see also *Artega* v. *State*, 72 N. Y. 2d 212, 219, 527 N. E. 2d 1194, 1198 (1988) ("In carrying out their duties relating to security and discipline in the difficult and sometimes highly stressful prison environment, correction employees . . . should not be inhibited because their conduct could be the basis of a damage claim").

[4] Although the State has waived its sovereign immunity from liability by allowing itself to be sued in the Court of Claims, a plaintiff seeking damages against the State in that court cannot use §1983 as a vehicle for redress because a State is not a "person" under §1983. See *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 66 (1989).

tion to facing a different defendant, plaintiffs in that Court are not provided with the same relief, or the same procedural protections, made available in §1983 actions brought in state courts of general jurisdiction. Specifically, under New York law, plaintiffs in the Court of Claims must comply with a 90-day notice requirement, Court of Claims Act §9; are not entitled to a jury trial, §12; have no right to attorney's fees, §27; and may not seek punitive damages or injunctive relief, *Sharapata* v. *Town of Islip*, 56 N. Y. 2d 332, 334, 437 N. E. 2d 1104, 1105 (1982).

We must decide whether Correction Law §24, as applied to §1983 claims, violates the Supremacy Clause.

## III

This Court has long made clear that federal law is as much the law of the several States as are the laws passed by their legislatures. Federal and state law "together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent." *Claflin* v. *Houseman*, 93 U. S. 130, 136–137 (1876); see *Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211, 222 (1916); The Federalist No. 82, p. 132 (E. Bourne ed. 1947) (A. Hamilton) ("[T]he inference seems to be conclusive, that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union, where it was not expressly prohibited"). Although §1983, a Reconstruction-era statute, was passed "to interpose the federal courts between the States and the people, as guardians of the people's federal rights," *Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972), state courts as well as federal courts are entrusted with providing a forum for the vindication of federal rights violated by state or local officials acting under color of state law. See *Patsy* v.

*Board of Regents of Fla.*, 457 U. S. 496, 506–507 (1982)
(canvassing the legislative debates of the 1871 Congress
and noting that "many legislators interpreted [§1983] to
provide dual or concurrent forums in the state and federal
system, enabling the plaintiff to choose the forum in which
to seek relief"); *Maine* v. *Thiboutot*, 448 U. S. 1, 3, n. 1
(1980).

So strong is the presumption of concurrency that it is
defeated only in two narrowly defined circumstances: first,
when Congress expressly ousts state courts of jurisdiction,
see *Bombolis*, 241 U. S., at 221; *Claflin*, 93 U. S., at 136;
and second, "[w]hen a state court refuses jurisdiction
because of a neutral state rule regarding the administra-
tion of the courts," *Howlett*, 496 U. S., at 372.  Focusing on
the latter circumstance, we have emphasized that only a
neutral jurisdictional rule will be deemed a "valid excuse"
for departing from the default assumption that "state
courts have inherent authority, and are thus presump-
tively competent, to adjudicate claims arising under the
laws of the United States." *Tafflin* v. *Levitt*, 493 U. S. 455,
458 (1990).

In determining whether a state law qualifies as a neu-
tral rule of judicial administration, our cases have estab-
lished that a State cannot employ a jurisdictional rule "to
dissociate [itself] from federal law because of disagreement
with its content or a refusal to recognize the superior
authority of its source." *Howlett*, 496 U. S., at 371.  In
other words, although States retain substantial leeway to
establish the contours of their judicial systems, they lack
authority to nullify a federal right or cause of action they
believe is inconsistent with their local policies.  "The sug-
gestion that [an] act of Congress is not in harmony with
the policy of the State, and therefore that the courts of the
State are free to decline jurisdiction, is quite inadmissible,
because it presupposes what in legal contemplation does
not exist." *Second Employers' Liability Cases*, 223 U. S. 1,

57 (1912).

It is principally on this basis that Correction Law §24 violates the Supremacy Clause. In passing Correction Law §24, New York made the judgment that correction officers should not be burdened with suits for damages arising out of conduct performed in the scope of their employment. Because it regards these suits as too numerous or too frivolous (or both), the State's longstanding policy has been to shield this narrow class of defendants from liability when sued for damages.[5] The State's policy, whatever its merits, is contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages. As we have unanimously recognized, "[a] State may not

_____

[5] In many respects, Correction Law §24 operates more as an immunity-from-damages provision than as a jurisdictional rule. Indeed, the original version of the statute gave correction officers qualified immunity, providing that no officer would be "liable for damages if he shall have acted in good faith, with reasonable care and upon probable cause." N. Y. Correct. Law. §6–b (McKinney Supp. 1947). And, more recently, a state legislative proposal seeking to extend Correction Law §24's scheme to other state employees explained that its purpose was to grant "the same immunity from civil damage actions as all other State employees who work in the prisons." App. 85.

In *Howlett* v. *Rose*, 496 U. S. 356 (1990), we considered the question whether a Florida school board could assert a state-law immunity defense in a §1983 action brought in state court when the defense would not have been available if the action had been brought in federal court. We unanimously held that the State's decision to extend immunity "over and above [that which is] already provided in §1983 . . . directly violates federal law," and explained that the "elements of, and the defenses to, a federal cause of action are defined by federal law." *Id.*, at 375; *Owen* v. *Independence,* 445 U. S. 622, 647, n. 30 (1980); see also R. Fallon, D. Meltzer, & D. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 1122 (5th ed. 2003) ("Federal law governs the immunity in [§1983] actions, even when brought against state officials"). Thus, if Correction Law §24 were understood as offering an immunity defense, *Howlett* would compel the conclusion that it violates the Supremacy Clause.

. . . relieve congestion in its courts by declaring a whole category of federal claims to be frivolous. Until it has been proved that the claim has no merit, that judgment is not up to the States to make." *Howlett*, 496 U. S., at 380; *Burnett* v. *Grattan*, 468 U. S. 42, 55 (1984) (rejecting as "manifestly inconsistent with the central objective of the Reconstruction–Era civil rights statutes" the judgment "that factors such as minimizing the diversion of state officials' attention from their duties outweigh the interest in providing employees ready access to a forum to resolve valid claims"). That New York strongly favors a rule shielding correction officers from personal damages liability and substituting the State as the party responsible for compensating individual victims is irrelevant. The State cannot condition its enforcement of federal law on the demand that those individuals whose conduct federal law seeks to regulate must nevertheless escape liability.

## IV

While our cases have uniformly applied the principle that a State cannot simply refuse to entertain a federal claim based on a policy disagreement, we have yet to confront a statute like New York's that registers its dissent by divesting its courts of jurisdiction over a disfavored federal claim in addition to an identical state claim. The New York Court of Appeals' holding was based on the misunderstanding that this equal treatment of federal and state claims rendered Correction Law §24 constitutional. 9 N. Y. 3d, at 489, 881 N. E. 2d, at 185 ("Put simply, because Correction Law §24 does not treat section 1983 claims differently than it treats related state law causes of action, the Supremacy Clause is not offended"). To the extent our cases have created this misperception, we now make clear that equality of treatment does not ensure that a state law will be deemed a neutral rule of judicial administration and therefore a valid excuse for

refusing to entertain a federal cause of action.

Respondents correctly observe that, in the handful of cases in which this Court has found a valid excuse, the state rule at issue treated state and federal claims equally. In *Douglas* v. *New York, N. H. & H. R. Co.*, 279 U. S. 377 (1929), we upheld a state law that granted state courts discretion to decline jurisdiction over state and federal claims alike when neither party was a resident of the State. Later, in *Herb* v. *Pitcairn*, 324 U. S. 117 (1945), a city court dismissed an action brought under the Federal Employers' Liability Act (FELA), 45 U. S. C. §51 *et seq.*, for want of jurisdiction because the cause of action arose outside the court's territorial jurisdiction. We upheld the dismissal on the ground that the State's venue laws were not being applied in a way that discriminated against the federal claim. 324 U. S., at 123. In a third case, *Missouri ex rel. Southern R. Co.* v. *Mayfield*, 340 U. S. 1 (1950), we held that a State's application of the *forum non conveniens* doctrine to bar adjudication of a FELA case brought by nonresidents was constitutionally sound as long as the policy was enforced impartially. *Id.*, at 4. And our most recent decision finding a valid excuse, *Johnson* v. *Fankell*, 520 U. S. 911 (1997), rested largely on the fact that Idaho's rule limiting interlocutory jurisdiction did not discriminate against §1983 actions. See *id.*, at 918.

Although the absence of discrimination is necessary to our finding a state law neutral, it is not sufficient. A jurisdictional rule cannot be used as a device to undermine federal law, no matter how evenhanded it may appear. As we made clear in *Howlett*, "[t]he fact that a rule is denominated jurisdictional does not provide a court an excuse to avoid the obligation to enforce federal law if the rule does not reflect the concerns of power over the person and competence over the subject matter that jurisdictional rules are designed to protect." 496 U. S., at 381. Ensuring equality of treatment is thus the beginning, not the end, of

the Supremacy Clause analysis.

In addition to giving too much weight to equality of treatment, respondents mistakenly treat this case as implicating the "great latitude [States enjoy] to establish the structure and jurisdiction of their own courts." *Id.*, at 372. Although Correction Law §24 denies state courts authority to entertain damages actions against correction officers, this case does not require us to decide whether Congress may compel a State to offer a forum, otherwise unavailable under state law, to hear suits brought pursuant to §1983. The State of New York has made this inquiry unnecessary by creating courts of general jurisdiction that routinely sit to hear analogous §1983 actions. New York's constitution vests the state supreme courts with general original jurisdiction, N. Y. Const., Art. VI, §7(a), and the "inviolate authority to hear and resolve all causes in law and equity." *Pollicina* v. *Misericordia Hospital Medical Center*, 82 N. Y. 2d 332, 339, 624 N. E. 2d 974, 977 (1993). For instance, if petitioner had attempted to sue a police officer for damages under §1983, the suit would be properly adjudicated by a state supreme court. Similarly, if petitioner had sought declaratory or injunctive relief against a correction officer, that suit would be heard in a state supreme court. It is only a particular species of suits—those seeking damages relief against correction officers—that the State deems inappropriate for its trial courts.[6]

———————

[6] While we have looked to a State's "common-law tort analogues" in deciding whether a state procedural rule is neutral, see *Felder* v. *Casey*, 487 U. S. 131, 146, n. 3 (1988), we have never equated "analogous claims" with "identical claims." Instead, we have searched for a similar claim under state law to determine whether a State has established courts of adequate and appropriate jurisdiction capable of hearing a §1983 suit. See *Testa* v. *Katt*, 330 U. S. 386, 388, 394 (1947); *Martinez* v. *California*, 444 U. S. 277, 283–284, n. 7 (1980) ("[W]here the same *type* of claim, if arising under state law, would be enforced in the state courts, the state courts are generally not free to refuse enforcement of

We therefore hold that, having made the decision to create courts of general jurisdiction that regularly sit to entertain analogous suits, New York is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy.[7]  A State's authority to organize its courts, while considerable, remains subject to the strictures of the Constitution. See, *e.g.*, *McKnett* v. *St. Louis & San Francisco R. Co.*, 292 U. S. 230, 233 (1934).  We have never treated a State's invocation of

_____

the federal claim" (emphasis added)).  Section 1983 damages claims against other state officials and equitable claims against correction officers are both sufficiently analogous to petitioner's §1983 claims.

[7] The dissent's contrary view is based on its belief that "States have unfettered authority to determine whether their local courts may entertain a federal cause of action." *Post*, at 8 (opinion of THOMAS, J.). But this theory of the Supremacy Clause was raised and squarely rejected in *Howlett*.  Respondents in that case "argued that a federal court has no power to compel a state court to entertain a claim over which the state court has no jurisdiction as a matter of state law."  496 U. S., at 381; see also Brief for National Association of Counties et al. as *Amici Curiae* in *Howlett* v. *Rose*, O. T. 1989, No. 89–5383, pp. 11–13 ("[S]tate courts are under no obligation to disregard even-handed jurisdictional limitations that exclude both state and federal claims"). We declared that this argument had "no merit" and explained that it ignored other provisions of the Constitution, including the Full Faith and Credit Clause and the Privileges and Immunities Clause, which compel States to open their courts to causes of action over which they would normally lack jurisdiction.  See 496 U. S., at 381–382; see also *Hughes* v. *Fetter*, 341 U. S. 609, 611 (1951) (interpreting the Full Faith and Credit Clause and concluding that a State cannot "escape [its] constitutional obligation to enforce the rights and duties validly created under the laws of other states by the simple device of removing jurisdiction from courts otherwise competent"); *Angel* v. *Bullington*, 330 U. S. 183, 188 (1947) (noting that the Constitution may "fetter the freedom of a State to deny access to its courts howsoever much it may regard such withdrawal of jurisdiction 'the adjective law of the State', or the exercise of its right to regulate 'the practice and procedure' of its courts"). We saw no reason to treat the Supremacy Clause differently.  *Howlett*, 496 U. S., at 382–383.  Thus, to the extent the dissent resurrects this argument, we again reject it.

"jurisdiction" as a trump that ends the Supremacy Clause inquiry, see *Howlett*, 496 U. S., at 382–383, and we decline to do so in this case. Because New York's supreme courts generally have personal jurisdiction over the parties in §1983 suits brought by prisoners against correction officers and because they hear the lion's share of all other §1983 actions, we find little concerning "power over the person and competence over the subject matter" in Correction Law §24. *Id*., at 381; see *id*., at 378 (conducting a similar analysis and concluding that the Florida courts of general jurisdiction were "fully competent to provide the remedies [§1983] requires").[8]

Accordingly, the dissent's fear that "no state jurisdictional rule will be upheld as constitutional" is entirely unfounded. *Post*, at 29, n. 10. Our holding addresses only the unique scheme adopted by the State of New York—a law designed to shield a particular class of defendants (correction officers) from a particular type of liability (damages) brought by a particular class of plaintiffs (prisoners). Based on the belief that damages suits against correction officers are frivolous and vexatious, see *supra*, at 3–4, n. 3, Correction Law §24 is effectively an immunity statute cloaked in jurisdictional garb. Finding this

––––––––

[8] The dissent's proposed solution would create a blind spot in the Supremacy Clause. If New York had decided to employ a procedural rule to burden the enforcement of federal law, the dissent would find the scheme unconstitutional. Yet simply because New York has decided to impose an even greater burden on a federal cause of action by selectively withdrawing the jurisdiction of its courts, the dissent detects no constitutional violation. Thus, in the dissent's conception of the Supremacy Clause, a State could express its disagreement with (and even open hostility to) a federal cause of action, declare a desire to thwart its enforcement, and achieve that goal by removing the disfavored category of claims from its courts' jurisdiction. If this view were adopted, the lesson of our precedents would be that other States with unconstitutionally burdensome procedural rules did not go far enough "to avoid the obligation to enforce federal law." *Howlett*, 469 U. S., at 381.

scheme unconstitutional merely confirms that the Supremacy Clause cannot be evaded by formalism.[9]

## V

The judgment of the New York Court of Appeals is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[9]A contrary conclusion would permit a State to withhold a forum for the adjudication of any federal cause of action with which it disagreed as long as the policy took the form of a jurisdictional rule. That outcome, in turn, would provide a roadmap for States wishing to circumvent our prior decisions. See *id.,* at 383 (rejecting a similar argument that would have allowed "the State of Wisconsin [to] overrule our decision in *Felder* . . . by simply amending its notice-of-claim statute to provide that no state court would have jurisdiction of an action in which the plaintiff failed to give the required notice").

# SUPREME COURT OF THE UNITED STATES

—————

No. 07–10374

—————

## KEITH HAYWOOD, PETITIONER *v.* CURTIS DROWN ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF NEW YORK

[May 26, 2009]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE ALITO join as to Part III, dissenting.

The Court holds that New York Correction Law Annotated §24, which divests New York's state courts of subject-matter jurisdiction over suits seeking money damages from correction officers, violates the Supremacy Clause of the Constitution, Art. VI, cl. 2, because it requires the dismissal of federal actions brought in state court under 42 U. S. C. §1983. I disagree. Because neither the Constitution nor our precedent requires New York to open its courts to §1983 federal actions, I respectfully dissent.

I

Although the majority decides this case on the basis of the Supremacy Clause, see *ante*, at 5–13, the proper starting point is Article III of the Constitution. Article III, §1, provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The history of the drafting and ratification of this Article establishes that it leaves untouched the States' plenary authority to decide whether their local courts will have subject-matter jurisdiction over federal causes of action.

The text of Article III reflects the Framers' agreement that the National Government needed a Supreme Court. There was sharp disagreement at the Philadelphia Convention, however, over the need for lower federal courts. Several of the Framers, most notably James Madison, favored a strong central government that included lower federal tribunals. Under the Virginia Plan, the Constitution would have established a "National Judiciary . . . to consist of one or more supreme tribunals, and of inferior tribunals to be chosen by the National Legislature." 1 Records of the Federal Convention of 1787, p. 21 (M. Farrand ed. 1911) (hereinafter Farrand). A revised version of the proposal, which stated that the National Judiciary would "'consist of One supreme tribunal, and of one or more inferior tribunals,'" was approved on June 4, 1787. *Id.*, at 95.

The following day, however, John Rutledge raised an objection to "establishing any national tribunal except a single supreme one." *Id.*, at 119. He proposed striking the language providing for the creation of lower federal courts because state courts were "most proper" for deciding "all cases in the first instance." *Ibid.* According to Rutledge, "the right of appeal to the supreme national tribunal [was] sufficient to secure the national rights [and] uniformity of Judgm[en]ts," and the lower federal courts were thus an "unnecessary encroachment" on the sovereign prerogative of the States to adjudicate federal claims. *Id.*, at 124. Madison nonetheless defended the Virginia Plan. He countered that "inferior [federal] tribunals . . . dispersed throughout the Republic" were necessary to meet the needs of the newly formed government: "An effective Judiciary establishment commensurate to the legislative authority [is] essential. A Government without a proper Executive [and] Judiciary would be the mere trunk of a body without arms or legs to act or move." *Ibid.* But despite Madison's objections, Rutledge's motion prevailed.

See *id.*, at 125.

Madison and James Wilson soon thereafter proposed alternative language that "'empowered [Congress] to institute inferior tribunals.'" *Ibid.* This version moderated the original Virginia Plan because of the "distinction between establishing such tribunals absolutely, and giving a discretion to the Legislature to establish or not establish [inferior federal courts]." *Ibid.* Over continued objections that such courts were an unnecessary expense and an affront to the States, the scaled-back version of the Virginia Plan passed. *Ibid.*

On June 15, 1787, however, the New Jersey Plan was introduced. Although it did not directly challenge the decision to permit Congress to "institute" inferior federal courts, the plan, among other things, required state courts to adjudicate federal claims. *Id.,* at 125, 243. In particular, the plan provided that, except for cases of impeachment (over which the Supreme Court would have original jurisdiction), "all punishments, fines, forfeitures [and] penalties . . . shall be adjudged by the Common law Judiciar[ies] of the State in which any offence contrary to the true intent [and] meaning of [federal law] shall have been committed or perpetrated, with liberty of commencing in the first instance all suits [and] prosecutions for that purpose in the superior Common law Judiciary in such State, subject nevertheless, for the correction of all errors, both in law [and] fact in rendering judgment, to an appeal to the Judiciary of the U[nited] States." *Id.*, at 243, 244.

The introduction of the New Jersey Plan reignited the debate over the need for lower federal courts. In light of the plan's provision for mandatory state-court jurisdiction over federal claims, Pierce Butler "could see no necessity for such tribunals." 2 *id.,* at 45. Luther Martin added that lower federal courts would "create jealousies [and] oppositions in the State tribunals, with the jurisdiction of which they will interfere." *Id.*, at 45–46. But Nathaniel

Ghorum responded that inferior federal tribunals were "essential to render the authority of the Nat[ional] Legislature effectual." *Id.*, at 46. Edmund Randolph bluntly argued that "the Courts of the States can not be trusted with the administration of the National laws." *Ibid.* George Mason suggested that, at the very least, "many circumstances might arise not now to be foreseen, which might render such a power absolutely necessary." *Ibid.* Roger Sherman also "was willing to give the power to the Legislature," even though he "wished them to make use of the State Tribunals whenever it could be done . . . with safety to the general interest." *Ibid.*

At the conclusion of this debate, the New Jersey Plan, including its component requiring state-court consideration of federal claims, was defeated and the Madison-Wilson proposal was delivered to the Committee of Detail, see *id.*, at 133. The Committee amended the proposal's language to its current form in Article III, which gives Congress the power to "ordain and establish" inferior federal courts. See *id.*, at 168. The delegates to the Constitutional Convention unanimously adopted this revised version, see *id.*, at 315, and it was ultimately ratified by the States.

This so-called Madisonian Compromise bridged the divide "between those who thought that the establishment of lower federal courts should be constitutionally mandatory and those who thought there should be no federal courts at all except for a Supreme Court with, *inter alia*, appellate jurisdiction to review state court judgments." R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 348 (4th ed. 1996). In so doing, the compromise left to the wisdom of Congress the creation of lower federal courts: "So far as the inferior Federal Courts were concerned, it was entirely discretionary with Congress to what extent it would vest Federal judicial power in them. It could grant to them as much or

as little as it chose of those classes of jurisdiction, enumerated in Article III as belonging to the judicial power of the United States.  It could, if it chose, leave to the State Courts all or any of these classes."   Warren, Federal Criminal Laws and the State Courts, 38 Harv. L. Rev. 545, 547 (1925) (footnote omitted).

The assumption that state courts would continue to exercise concurrent jurisdiction over federal claims was essential to this compromise.  See The Federalist No. 82, pp. 130, 132 (E. Bourne ed. 1947) (A. Hamilton) ("[T]he inference seems to be conclusive, that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union, where it was not expressly prohibited").[1]   In light of that historical understanding, this Court has held that, absent an Act of Congress providing for exclusive jurisdiction in the lower federal courts, the "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin* v. *Levitt*, 493 U. S. 455, 458–459 (1990); see also *Plaquemines Tropical Fruit Co.* v. *Henderson*, 170 U. S. 511, 517–518 (1898)

----

[1] Alexander Hamilton's recognition of "concurrent jurisdiction" should not be mistaken for a suggestion that the Constitution *requires* state courts to hear federal claims.  See *ante*, at 5 (opinion of STEVENS, J.). He merely understood that the States would be "divested of no part of their primitive jurisdiction" and state courts "in every case in which they were not expressly excluded by the future acts of the national legislature . . . [would] of course take cognizance of the causes to which those acts may give birth."  The Federalist No. 82, at 132.  Hamilton thus assumed that state courts would continue to entertain federal claims consistent with their "primitive jurisdiction" under state law. *Ibid.*  But he remained skeptical that state courts could be forced to entertain federal causes of action when state law deprived them of jurisdiction over such claims.  See Hamilton, The Examination No. 6, (Jan. 2, 1802), in 25 Papers of Alexander Hamilton 484, 487–488 (H. Syrett ed. 1977) ("[I]t is not to be forgotten, that the right to employ the agency of the State Courts for executing the laws of the Union, is liable to question, and has, in fact, been seriously questioned").

("'[I]n judicial matters, the concurrent jurisdiction of the state tribunals depends altogether upon the pleasure of congress, and may be revoked and extinguished whenever they think proper, in every case in which the subject matter can constitutionally be made cognizable in the federal courts; and that, without an express provision to the contrary, the state courts will retain a concurrent jurisdiction in all cases where they had jurisdiction originally over the subject matter" (quoting 1 J. Kent, Commentaries on American Law 374–375 (1826) (hereinafter Kent))). As a result, "if exclusive jurisdiction [in the federal courts] be neither express nor implied, the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it." *Claflin* v. *Houseman*, 93 U. S. 130, 136 (1876).

The Constitution's implicit preservation of state authority to entertain federal claims, however, did not impose a duty on state courts to do so. As discussed above, there was at least one proposal to expressly require state courts to take original jurisdiction over federal claims (subject to appeal in federal court) that was introduced in an attempt to forestall the creation of lower federal courts. See *supra*, at 3–4. But in light of the failure of this proposal—which was offered before the adoption of the Madisonian Compromise—the assertions by its supporters that state courts would ordinarily entertain federal causes of action cannot reasonably be viewed as an assurance that the States would never alter the subject-matter jurisdiction of their courts. The Framers' decision to empower Congress to create federal courts that could either supplement or displace state-court review of federal claims, as well as the exclusion of any affirmative command requiring the States to consider federal claims in the text of Article III, confirm this understanding. See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 848 (1995) (THOMAS, J., dissenting) ("Where the Constitution is silent about the exercise of a

particular power—that is, where the Constitution does not speak either expressly or by necessary implication—the Federal Government lacks that power and the States enjoy it").[2]

The earliest decisions addressing this question, written by then-serving and future Supreme Court Justices, confirm that state courts remain "tribunals over which the government of the Union has no adequate control, and which may be closed to any claim asserted under a law of the United States." *Osborn* v. *Bank of United States,* 9 Wheat. 738, 821 (1824); see also *Stearns* v. *United States*, 22 F. Cas. 1188, 1192 (No. 13, 341) (DC Vt. 1835) (Thompson, J.) (Article III does not give Congress authority to "compel a state court to entertain jurisdiction in any case; they are not inferior courts in the sense of the constitution; they are not ordained by congress. State courts are left to consult their own duty from their own state authority and organization"). "The states, in providing their own

_____

[2] See also Collins, Article III Cases, State Court Duties, and the Madisonian Compromise, 1995 Wis. L. Rev. 39, 144 (1995) (hereinafter Collins) ("It is . . . extremely difficult to argue from the debatable assumption that state courts would be under an obligation to take all Article III judicial business in the first instance—as a quid pro quo for the Constitution's noninclusion of any reference to lower federal courts—to the conclusion that such a duty still existed when the second half of that bargain was decisively rejected (in the Madisonian Compromise, no less)"); Pfander, Rethinking the Supreme Court's Original Jurisidiction in State-Party Cases, 82 Cal. L. Rev. 555, 596 (1994) ("The framers may well have assumed that the federal system would simply take the state courts as it found them; state courts could exercise a concurrent jurisdiction over any federal claims that fit comfortably within their pre-existing jurisdiction—what Hamilton in *The Federalist* called their primitive jurisdiction—so long as the federal claims were not, by virtue of congressional decree, subject to the exclusive jurisdiction of the federal courts. It seems unlikely, however, that the framers would have chosen to compel the state courts to entertain federal claims against their will and in violation of their own jurisdictional limits" (footnotes omitted)).

judicial tribunals, have a right to limit, control, and re-strict their judicial functions, and jurisdiction, according to their own mere pleasure." *Mitchell* v. *Great Works Milling & Mfg. Co.*, 17 F. Cas. 496, 499 (No. 9,662) (CCD Me. 1843) (Story, J.). In short, there was "a very clear intimation given by the judges of the Supreme Court, that the state courts were not bound in consequence of any act of congress, to assume and exercise jurisdiction in such cases. It was merely permitted to them to do so as far, as was compatible with their state obligations." Kent 375; see also *id.*, at 377 (explaining that the Constitution "per-mits state courts which are competent for the purpose, and have an inherent jurisdiction adequate to the case, to entertain suits in the given cases").

Under our federal system, therefore, the States have unfettered authority to determine whether their local courts may entertain a federal cause of action. Once a State exercises its sovereign prerogative to deprive its courts of subject-matter jurisdiction over a federal cause of action, it is the end of the matter as far as the Constitu-tion is concerned.

The present case can be resolved under this principle alone. New York Correction Law Annotated §24, ¶1 (West 1987) (NYCLA) provides that "[n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or em-ployee of the department, in his personal capacity, for damages arising out of any act done or the failure to per-form any act within the scope of the employment and in the discharge of the duties by such officer or employee." The majority and petitioner agree that this statute erects a jurisdictional bar that prevents the state courts from entertaining petitioner's claim for damages under §1983. See *ante*, at 4 (agreeing that "a prisoner seeking damages from a correction officer will have his claim dismissed for want of jurisdiction"); Brief for Petitioner 21 ("Every New

York court must immediately dismiss such suits for lack of jurisdiction, regardless of merit"). Because New York's decision to withdraw jurisdiction over §1983 damages actions—or indeed, over any claims—does not offend the Constitution, the judgment below should be affirmed.

## II

The Court has evaded Article III's limitations by finding that the Supremacy Clause constrains the States' authority to define the subject-matter jurisdiction of their own courts. See *ante*, at 5–8. In particular, the Court has held that "the Federal Constitution prohibits state courts of general jurisdiction from refusing" to entertain a federal claim "solely because the suit is brought under a federal law" as a "state may not discriminate against rights arising under federal laws." *McKnett* v. *St. Louis & San Francisco R. Co.*, 292 U. S. 230, 233–234 (1934). There is no textual or historical support for the Court's incorporation of this antidiscrimination principle into the Supremacy Clause.

## A

### 1

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Under this provision, "[t]he laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. . . . The two together form one system of jurisprudence, which constitutes the law of the land for the State." *Claflin*, 93 U. S., at 136–137; see also *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991); *Robb* v. *Connolly*, 111 U. S. 624, 637

(1884). Thus, a valid federal law is substantively superior to a state law; "if a state measure conflicts with a federal requirement, the state provision must give way." *Swift & Co.* v. *Wickham*, 382 U. S. 111, 120 (1965). As a textual matter, however, the Supremacy Clause does not address whether a state court must entertain a federal cause of action; it provides only a rule of decision that the state court must follow if it adjudicates the claim. See R. Berger, Congress v. The Supreme Court 245 (1969) (The Supremacy Clause only "'enacts what the law shall be'. . . . [I]t defines the governing 'supreme law,' and *if* a State court *has* jurisdiction, it commands that that law shall govern").

The Supremacy Clause's path to adoption at the Convention confirms this focus. Its precursor was introduced as part of the New Jersey Plan. See 1 Farrand 245 ("[A]ll Acts of . . . Cong[ress] made by virtue [and] in pursuance of the powers hereby . . . vested in them . . . shall be the supreme law of the respective States so far forth as those Acts . . . shall relate to the said States or their Citizens"); *ibid.* ("[T]he Judiciary of the several States shall be bound thereby in their decisions, any thing in the respective laws of the Individual States . . . notwithstanding"). But, as explained above, see *supra*, at 3–4, the New Jersey Plan also included an entirely separate provision that addressed state-court jurisdiction, which would have required all federal questions to "b[e] determined in the first instance in the courts of the respective states." 3 Farrand 287. These two provisions of the New Jersey Plan worked in tandem to require state courts to entertain federal claims and to decide the substantive dispute in favor of federal law if a conflict between the two arose.

After the adoption of the Madisonian Compromise and the defeat of the New Jersey Plan, the Framers returned to the question of federal supremacy. A proposal was introduced granting Congress the power to "'negative all

laws passed by the several States (contravening in the opinion of [Congress] the articles of Union, or any treaties subsisting under the authority of [Congress]).'" 2 *id.,* at 27. James Madison believed the proposal "essential to the efficacy [and] security of the [federal] Gov[ernmen]t." *Ibid.* But others at the Convention, including Roger Sherman, "thought it unnecessary, as the Courts of the States would not consider as valid any law contravening the Authority of the Union, and which the legislature would wish to be negatived." *Ibid.* In the end, Madison's proposal was defeated. *Id.*, at 28. But as a substitute for that rejected proposal, Luther Martin resurrected the Supremacy Clause provision from the New Jersey Plan and it was unanimously approved. See *id.,* at 28–29.[3]

This historical record makes clear that the Supremacy Clause's exclusive function is to disable state laws that are substantively inconsistent with federal law—not to require state courts to hear federal claims over which the courts lack jurisdiction. This was necessarily the case when the clause was first introduced as part of the New Jersey Plan, as it included a separate provision to confront the jurisdictional question. Had that plan prevailed and been ratified by the States, construing the Supremacy Clause to address state-court jurisdiction would have rendered the separate jurisdictional component of the New Jersey Plan mere surplusage. See *Marbury* v. *Madison*, 1 Cranch 137, 174 (1803) ("It cannot be presumed that any

---

[3] As proposed by Luther Martin, the Clause provided as follows: "'[T]hat the Legislative acts of the [United States] made by virtue [and] in pursuance of the articles of Union, and all treaties made [and] ratified under the authority of the [United States] shall be the supreme law of the respective States, as far as those acts or treaties shall relate to the said States, or their Citizens and inhabitants—[and] that the Judiciaries of the several States shall be bound thereby in their decisions, any thing in the respective laws of the individual States to the contrary notwithstanding.'" 2 Farrand 28–29.

clause in the constitution is intended to be without effect”); see also *Kelo* v. *New London*, 545 U. S. 469, 507 (2005) (THOMAS, J., dissenting).

The Supremacy Clause’s exclusive focus on substantive state law is also evident from the context in which it was revived. First, the Clause was not adopted until after the New Jersey Plan’s rejection, as part of the entirely separate debate over Madison’s proposal to grant Congress the power to “negative” the laws of the States. By then, the Framers had already adopted Article III, thereby ending the fight over state-court jurisdiction. The question before the Convention thus was not which courts (state or federal) were best suited to adjudicate federal claims, but which branch of government (Congress or the courts) would be most effective in vindicating the substantive superiority of federal law. The Supremacy Clause was directly responsive to that question.

Second, the timing of the Clause’s adoption suggests that the Framers viewed it as achieving the same end as Madison’s congressional “negative” proposal. Although Madison believed that Congress could most effectively countermand inconsistent state laws,[4] the Framers de-

---

[4] Madison did not believe that federal courts were up to the task. See Letter from James Madison to Thomas Jefferson (Oct. 24, 1787), reprinted in 3 *id.,* at 131, 134 (“It may be said that the Judicial authority, under our new system will keep the States within their proper limits, and supply the place of a negative on their laws. The answer is, that it is more convenient to prevent the passage of a law than to declare it void after it is passed; that this will be particularly the case, where the law aggrieves individuals, who may be unable to support an appeal [against] a State to the supreme Judiciary; that a State which would violate the Legislative rights of the Union, would not be very ready to obey a Judicial decree in support of them, and that a recurrence to force, which, in the event of disobedience would be necessary, is an evil which the new Constitution meant to exclude as far as possible”). He had even less faith in state courts. See 2 *id.,* at 27–28 (“Confidence can (not) be put in the State Tribunals as guardians of the National authority and interests”). In light of Madison’s mistrust of

cided that the Judiciary could adequately perform that function. There is no evidence that the Framers envisioned the Supremacy Clause as having a substantively broader sweep than the proposal it replaced. And, there can be no question that Madison's congressional "negative" proposal was entirely unconcerned with the dispute over whether state courts should be required to exercise jurisdiction over federal claims. Indeed, Madison's proposal did not require the States to become enmeshed in any federal business at all; it merely provided that state laws could be directly nullified if Congress found them to be inconsistent with the Constitution or laws of the United States. The role of the Supremacy Clause is no different. It does not require state courts to entertain federal causes of action. Rather, it only requires that in reaching the merits of such claims, state courts must decide the legal question in favor of the "law of the Land." Art. VI, cl. 2.

For this reason, Representative Fisher Ames explained during the debate over the First Judiciary Act that "[t]he law of the United States is a rule to [state-court judges], but no authority for them. It controlled their decisions, but could not enlarge their powers." 1 Annals of Congress 808 (1789) (reprint 2003). And because the Constitution requires from state judges only an oath of "Allegiance and not an Oath of Office," the federal government "[c]annot compel them to act—or to become our Officers." Notes of William Patterson from Speech on Judiciary Act (June 23, 1789), in 9 Documentary History of the First Federal Congress 1789–1791, p. 477 (K. Bowling & H. Veit eds. 1988); 1 Annals of Congress 805 (remarks of Rep. Sedg-

———————

state courts, any suggestion that he drafted Article III to require state courts to entertain federal claims, or that he advocated for the inclusion in the Constitution of a provision guaranteeing the supremacy of federal law as a means of accomplishing that same goal, would be doubtful. Madison appears to have preferred that the state courts hear as little federal business as possible.

wick, Debate of Aug. 29, 1789) (arguing that inferior federal courts should be established because state courts "might refuse or neglect to attend to the national business"); 10 *id.,* at 892 (remarks of Rep. Harper) (explaining that Congress "cannot enforce on the State courts, as a matter of duty, a performance of the acts we confide to them" but arguing that there was "no cause to complain" "until they refuse to exercise" the jurisdiction granted over federal claims).[5]

The supremacy of federal law, therefore, is not impugned by a State's decision to strip its local courts of subject-matter jurisdiction to hear certain federal claims. Subject-matter jurisdiction determines only whether a court has the power to entertain a particular claim—a condition precedent to reaching the merits of a legal dis-

———————

[5] The majority contends that the Full Faith and Credit Clause and the Privileges and Immunities Clause support its view of the Supremacy Clause because each "compel[s] States to open their courts to causes of action over which they would normally lack jurisdiction." *Ante*, at 11, n. 7 (citing *Howlett* v. *Rose*, 496 U. S. 356, 381–382 (1990)). But the majority has it backwards. The Full Faith and Credit Clause and the Privileges and Immunities Clause include a textual prohibition on discrimination that the Supremacy Clause lacks. See Art. IV, §1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State"); Art. IV, §2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States"). The Framers' decision to address state-to-state discrimination in these two clauses without taking similar steps with respect to federal-state relations governed by the Supremacy Clause aligns with reasons given for abandoning the Articles of Confederation, see The Federalist No. 42, p. 292 (E. Bourne ed. 1947) (J. Madison) (describing the Full Faith and Credit Clause as "an evident and valuable improvement on the clause relating to this subject in the articles of Confederation"), and the principle of dual sovereignty that the Constitution preserves, see *Texas* v. *White*, 7 Wall. 700, 725 (1869). Accordingly, contrary to the majority's supposition, there are in fact strong "reason[s] to treat the Supremacy Clause differently," *ante*, at 11, n. 7, from the Full Faith and Credit and Privileges and Immunities Clauses.

pute. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to de-clare the law, and when it ceases to exist, the only func-tion remaining to the court is that of announcing the fact and dismissing the cause" (internal quotation marks omitted)). Although the line between subject-matter jurisdiction over a claim and the merits of that claim can at times prove difficult to draw, see *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 513–515 (2006), see also *Bell* v. *Hood*, 327 U. S. 678, 682 (1946), the distinction is crucial in the Supremacy Clause context. If the state court does not reach the merits of the dispute for lack of statutory or constitutional jurisdiction, the preeminence of federal law remains undiminished.

Accordingly, the superiority of federal law as a substan-tive matter does not trigger an obligation on States to keep their courts jurisdictionally neutral with respect to federal and state-law claims. "The federal law in any field within which Congress is empowered to legislate is the supreme law of the land in the sense that it may supplant state legislation in that field, but not in the sense that it may supplant the existing rules of litigation in state courts. Congress has full power to provide its own courts for litigating federal rights. The state courts belong to the States." *Brown* v. *Gerdes*, 321 U. S. 178, 193 (1944) (Frankfurter, J., concurring).

2

The Court was originally faithful to this conception of federal supremacy. In *Claflin*, the Court concluded that because the federal statute under consideration did not deprive the state court of jurisdiction, the state court was competent to resolve the claim. See 93 U. S., at 136–137 ("[R]ights, whether legal or equitable, acquired under the laws of the United States, may be prosecuted in the

United States courts, or in the State courts, competent to decide rights of the like character and class; subject, however, to this qualification, that where a right arises under a law of the United States, Congress may, if it see[s] fit, give to the Federal courts exclusive jurisdiction"). But the Court was careful to also explain that the Constitution did not impose an obligation on the States to accept jurisdiction over such claims. See *id.*, at 137 (explaining that there "is no reason why the State courts should not be open for the prosecution of rights growing out of the laws of the United States, to which their jurisdiction is competent, and not denied"). The Constitution instead left the States with the choice—but not the obligation—to entertain federal actions. See *id.*, at 139 ("[W]here no direction is given [from Congress] on the subject, it was assumed, in our early judicial history, that the State courts retained their usual jurisdiction concurrently with the Federal Courts invested with jurisdiction in like cases").

Then in *Second Employers' Liability Cases,* 223 U. S. 1 (1912), the Court applied the rule set forth in *Claflin* and correctly rejected a Connecticut court's refusal to enforce the 1908 Federal Employers' Liability Act (FELA), 45 U. S. C. §51 *et seq.* FELA neither provided for exclusive federal jurisdiction nor attempted to require state courts to entertain claims brought under it. See 223 U. S., at 54–55. Therefore, the statute was enforceable "as of right, in the courts of the States *when their jurisdiction, as prescribed by local laws, is adequate to the occasion.*" *Id.,* at 55 (emphasis added). Connecticut had not deprived its courts of subject-matter jurisdiction over FELA claims; thus, the state court's refusal to hear the claim was "not because the ordinary jurisdiction of the Superior Courts, as defined by the constitution and laws of the State, was deemed inadequate or not adapted to the adjudication of such a case." *Ibid.* Rather, the state court took the position that "it would be inconvenient and confusing for the

same court, in dealing with cases of the same general class, to apply in some the standards of right established by the congressional act and in others the different standards recognized by the laws of the State." *Id.*, at 55–56.

The Court's reversal of such a decision is compatible with the original understanding of Article III and the Supremacy Clause. Because there was no question that the state court had subject-matter jurisdiction under state law to adjudicate the federal claim, *id.*, at 57, the Court correctly observed that the state court's refusal to decide the case amounted to a policy dispute with federal law: "When Congress, in the exertion of the power confided to it by the Constitution, adopted that [federal] act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of Connecticut as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State." *Ibid.* It was for this specific reason, then, that the Court rejected Connecticut's refusal to adjudicate the federal claim. As the Court correctly noted, the "existence of the jurisdiction creates an implication of duty to exercise it, and that its exercise may be onerous does not militate against that implication." *Id.*, at 58.

But nothing in *Second Employers'* suggested that the Supremacy Clause could pre-empt a state law that deprived the local court of subject-matter jurisdiction over the federal claim. Instead, the *Second Employers'* Court took exactly the opposite position on this question: "[W]e deem it well to observe that there is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts . . . but only a question of the duty of such a court, when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion." *Id.*, at 56–57.

The Court again confronted this issue in *Douglas* v. *New York, N. H. & H. R. Co.*, 279 U. S. 377 (1929). There, the Court considered whether a New York court was required

to hear a claim brought under FELA. Unlike the Connecticut court in *Second Employers'*, however, the New York court did not have jurisdiction under state law to entertain the federal cause of action. 279 U. S., at 386–387. As a result, this Court upheld the state-court ruling that dismissed the claim. The Court explained that FELA did "not purport to require State Courts to entertain suits arising under it, but only to empower them to do so, so far as the authority of the United States is concerned. It may very well be that if the Supreme Court of New York [was] given no discretion, being otherwise competent, it would be subject to a duty. But there is nothing in the Act of Congress that purports to force a duty upon such Courts as against an otherwise valid excuse." *Id.*, at 387–388. In other words, because the New York court lacked subject-matter jurisdiction under state law, it was not "otherwise competent" to adjudicate the federal claim.

In sum, *Claflin*, *Second Employers'*, and *Douglas* together establish that a state court's inability to entertain a federal claim because of a lack of state-law jurisdiction is an "otherwise valid excuse" that in no way denies the superiority of federal substantive law. It simply disables the state court from adjudicating a claim brought under that federal law.

3

It was not until five years after *Douglas* that the Court used the Supremacy Clause to strike down a state jurisdictional statute for its failure to permit state-court adjudication of federal claims. See *McKnett*, 292 U. S. 230. The Court started by correctly noting that it "was settled" in *Second Employers'* "that a state court whose ordinary jurisdiction as prescribed by local laws is appropriate to the occasion, may not refuse to entertain suits under [FELA]." 292 U. S., at 233. Yet, even though the Alabama court *lacked* such jurisdiction over the relevant federal

claim pursuant to a state statute, the *McKnett* Court held that the state court had improperly dismissed the federal claim. *Id.*, at 231–234.

According to the Court, "[w]hile Congress has not attempted to compel states to provide courts for the enforcement of [FELA], the Federal Constitution prohibits state courts of general jurisdiction from refusing to do so solely because the suit is brought under a federal law. The denial of jurisdiction by the Alabama court is based solely upon the source of law sought to be enforced. The plaintiff is cast out because he is suing to enforce a federal act. A state may not discriminate against rights arising under federal laws." *Id.*, at 233–234.

For all the reasons identified above, *McKnett* cannot be reconciled with the decisions of this Court that preceded it. Unlike the Connecticut court in *Second Employers'*, the Alabama Supreme Court did not indulge its own bias against adjudication of federal claims in state court by refusing to hear a federal claim over which it had subject-matter jurisdiction. Rather, like the New York court decision affirmed in *Douglas*, the Alabama court's dismissal merely respected a jurisdictional barrier to adjudication of the federal claim imposed by state law. The fact that Alabama courts were competent to hear similar state-law claims should have been immaterial. Alabama had exercised its sovereign right to establish the subject-matter jurisdiction of its courts. Under *Claflin* and its progeny, that legislative judgment should have been upheld.

Despite *McKnett*'s infidelity to the Constitution and more than a century of Supreme Court jurisprudence, the Court's later decisions have repeated *McKnett*'s declaration that state jurisdictional statutes must be policed for antifederal discrimination. See, *e.g.*, *Testa* v. *Katt*, 330 U. S. 386, 394 (1947) ("It is conceded that this same type of claim arising under Rhode Island law would be enforced

by that State's courts. . . . Under these circumstances the State courts are not free to refuse enforcement of petitioners' claim"); *Howlett* v. *Rose*, 496 U. S. 356, 375 (1990) ("[W]hether the question is framed in pre-emption terms, as petitioner would have it, or in the obligation to assume jurisdiction over a 'federal' cause of action, . . . the Florida court's refusal to entertain one discrete category of §1983 claims, when the court entertains similar state-law actions against state defendants, violates the Supremacy Clause"). The outcome in these cases, however, can be reconciled with first principles notwithstanding the Court's stated reliance on *McKnett*'s flawed interpretation of the Supremacy Clause.[6]

In *Testa*, the Court struck down the Rhode Island Supreme Court's refusal to entertain a claim under the federal Emergency Price Control Act. There was no dispute that "the Rhode Island courts [had] jurisdiction adequate and appropriate under established local law to adjudicate this action." 330 U. S., at 394, and n. 13. The Rhode Island court nevertheless declined to exercise that juris-

--------

[6] Other decisions also have articulated this antidiscrimination principle. See, *e.g.*, *Johnson* v. *Fankell*, 520 U. S. 911 (1997); *Missouri ex rel. Southern R. Co.* v. *Mayfield*, 340 U. S. 1 (1950); *Herb* v. *Pitcairn*, 324 U. S. 117 (1945); *Miles* v. *Illinois Central R. Co.*, 315 U. S. 698 (1942). The outcomes in these cases nonetheless preserved state-court jurisdictional autonomy. In *Johnson* and *Herb*, the Court sustained the state-court dismissals of the federal claims as nondiscriminatory. See *Johnson*, *supra,* at 918–920; *Herb*, *supra,* at 123. In *Mayfield*, the Court never decided whether the state court had jurisdiction over the relevant federal claim; rather, it remanded the case to the Missouri Supreme Court based on the state court's possibly erroneous interpretation of federal law at issue in that case. See 340 U. S., at 4–5. Finally, in *Miles*, the Court struck down a Tennessee decision that enjoined a citizen of that State from pursuing a FELA action in Missouri state court "on grounds of inequity." 315 U. S., at 702. The Court correctly held that, so long as jurisdiction existed under Missouri law, the Tennessee court could not rely on its own notions of "inequity" to thwart the vindication of a federal right in state court. *Ibid.*

diction under its decision in *Robinson* v. *Norato*, 71 R. I. 256, 258, 43 A. 2d 467, 468 (1945), which had relied on a "universally acknowledged" doctrine "of private international law" as a basis for refusing to adjudicate federal "penal" claims. Because the Rhode Island Supreme Court had invoked this common-law doctrine despite the existence of state-law statutory jurisdiction over the federal claims, this Court correctly ruled that the state court's "policy against enforcement . . . of statutes of other states and the United States which it deems penal, [could not] be accepted as a 'valid excuse.'" 330 U. S., at 392–393.

*Testa* thus represents a routine application of the rule of law set forth in *Second Employers'*: As long as jurisdiction over a federal claim exists as a matter of state law, state-court judges cannot *sua sponte* refuse to enforce federal law because they disagree with Congress' decision to allow for adjudication of certain federal claims in state court. See 330 U. S., at 393 ("[A] state court cannot 'refuse to enforce the right arising from the law of the United States because of conceptions of impolicy or want of wisdom on the part of Congress in having called into play its lawful powers'" (quoting *Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211, 222 (1916)).[7]

_____

[7] Despite suggestions to the contrary, see *ante*, at 5; *Howlett* v. *Rose*, 496 U. S. 356 (1990), the Court's decision in *Bombolis*, 241 U. S. 211, which held that the Seventh Amendment does not require a unanimous jury verdict when federal civil claims are adjudicated in state court, provides no support for the antidiscrimination principle. As quoted above, the Court (in dicta) accurately summarized the holding of *Second Employers'*. See 241 U. S., at 222. The Court also reiterated that before a state court owes a duty to enforce federal law, it must have subject-matter jurisdiction over the claim under state law. See *id.*, at 221 ("[L]awful rights of the citizen, whether arising from a legitimate exercise of state or national power . . . are concurrently subject to be enforced in the courts of the State or nation when such rights come within the general scope of the jurisdiction conferred upon such courts by the authority, State or nation, creating them"); *id.*, at

In *Howlett*, the Court likewise correctly struck down a Florida Supreme Court decision affirming the dismissal of a §1983 suit on state-law sovereign immunity grounds. See 496 U. S., at 361, 375–381. The Florida court had interpreted the State's statutory "waiver of sovereign immunity" not to extend to federal claims brought in state court. *Id.*, at 361 (citing Fla. Stat. §768.28 (1989)). According to the state court, absent a statutory waiver, Florida's pre-existing common-law sovereign immunity rule provided a "blanket immunity on [state] governmental entities from federal civil rights actions under §1983" brought in Florida courts. 496 U. S., at 364. Based on this rule, the Florida Supreme Court affirmed the dismissal with prejudice of the §1983 suit against the state officials. See *id.*, at 359; see also *Howlett* v. *Rose*, 537 So. 2d 706, 708 (Fla. App. 1989) (concluding that Florida's "common law immunity" rule barred "the use of its courts for suits against the state in those state courts").

No antidiscrimination rule was required to strike down the Florida Supreme Court's decision. Even though several Florida courts had concluded that the defense of sovereign immunity was jurisdictional, see 496 U. S., at 361, n. 5, "[t]he force of the Supremacy Clause is not so weak that it can be evaded by mere mention of the word 'jurisdiction,'" *id.,* at 382–383. That is, state courts cannot evade their obligation to enforce federal law by simply characterizing a statute or common-law rule as "jurisdictional"; the state law must in fact operate in a jurisdictional manner. No matter where the line between subject-matter jurisdiction and the merits is drawn, see *supra*, at

_____

222 (explaining that state courts are "charged with the duty to safeguard and enforce the right of every citizen without reference to the particular exercise of governmental power from which the right may have arisen, if only the authority to enforce such right comes generally within the scope of the jurisdiction conferred by the government creating them").

14, Florida's "common law immunity" rule crossed it.

First, because the Florida Supreme Court had dismissed the §1983 lawsuit with prejudice, its decision was on the merits. Cf. *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U. S. 497, 505 (2001) ("'With prejudice' is an acceptable form of shorthand for 'an adjudication upon the merits'" (quoting 9 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §2373, p. 396, n. 4 (1981))). Second, Florida's sovereign immunity rule violated the Supremacy Clause by operating as a state-law defense to a federal law. See *Martinez* v. *California*, 444 U. S. 277, 284, n. 8 (1980) ("'[P]ermitt[ing] a state immunity defense to have controlling effect'" over a federal claim violates the Supremacy Clause). Resolving a federal claim with preclusive effect based on a state-law defense is far different from simply closing the door of the state courthouse to that federal claim. The first changes federal law by denying relief on the merits; the second merely dictates the forum in which the federal claim will be heard.

In the end, of course, "the ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 491–492 (1939) (Frankfurter, J., concurring). And contrary to *McKnett*, the Constitution does not require state courts to give equal billing to state and federal claims. To read the Supremacy Clause to include an antidiscrimination principle undermines the compromise that shaped Article III and contradicts the original understanding of Constitution. There is no justification for preserving such a principle. But even if the Court chooses to adhere to the antidiscrimination rule as part of the Supremacy Clause inquiry, the rule's infidelity to the text, structure, and history of the Constitution counsels against extending the principle any further than our precedent requires. Cf. *United States* v. *Lopez*, 514 U. S. 549, 584–585 (1995) (THOMAS, J., concurring); see *infra*, at 27–33.

B

Although the Supremacy Clause does not, on its own force, pre-empt state jurisdictional statutes of any kind, it may still pre-empt state law once Congress has acted. Federal law must prevail when Congress validly enacts a statute that expressly supersedes state law, see *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 62–63 (2002); *United States* v. *Locke*, 529 U. S. 89, 109 (2000), or when the state law conflicts with a federal statute, see *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214 (1998); *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132 (1963). NYCLA §24 does not fall prey to either category of pre-emption.[8]

First, federal law does not expressly require New York courts to accept jurisdiction over §1983 suits. Under §1983, any state official who denies "any citizen of the United States or other person within the jurisdiction thereof . . . any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." The statute addresses who may sue and be sued for violations of federal law. But it in-

_____

[8] Because 42 U. S. C. §1983 does not pre-empt NYCLA §24, there is no need to reach the more difficult question of whether Congress has the delegated authority under the Constitution to require state courts to entertain a federal cause of action. Compare *Printz* v. *United States*, 521 U. S. 898, 907 (1997) (suggesting that Congress' authority in this regard was "perhaps implicit in one of the provisions of the Constitution [Article III, §1], and was explicit in another [Article VI, cl. 2]"); Prakash, Field Office Federalism, 79 Va. L. Rev. 1957, 2032 (1993) ("As a matter of original understanding, the Founding Generation understood that state courts could be commandeered to enforce federal law"), with *Prigg* v. *Pennsylvania*, 16 Pet. 539, 615 (1842) (concluding that state courts could not "be compelled to enforce" the 1793 Fugitive Slave Act); Collins 45 (concluding as an original matter that "states did not have to accept unwanted federal civil and criminal judicial business, and that Congress could not compel them to do so").

cludes no substantive command requiring New York to provide a state judicial forum to a §1983 plaintiff. See *Felder* v. *Casey*, 487 U. S. 131, 158 (1988) (O'Connor, J., dissenting) ("Section 1983 ... creates no substantive law. ... Its purpose, as we have repeatedly said, 'was to interpose the *federal courts* between the States and the people, as guardians of the people's federal rights'" (quoting *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 503 (1982))). Like FELA, therefore, §1983 does not "enlarge or regulate the jurisdiction of state courts." *Second Employers',* 223 U. S., at 56.[9]

Second, NYCLA §24 does not conflict with §1983. See *Wyeth* v. *Levine*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 9) (THOMAS, J., concurring in judgment) (explaining that the Court has alternatively described the standard for conflict pre-emption as "physical impossibility" and "direct conflict" (citations omitted)). As explained above, Congress did not grant §1983 plaintiffs a "right" to bring their claims in state court or "guarantee" that the state forum would remain open to their suits. See *id.,* at \_\_\_ (slip op., at 12). Moreover, Congress has created inferior federal courts that have the power to adjudicate all §1983 actions. And this Court has expressly determined that §1983 plaintiffs do not have to exhaust state-court remedies before proceeding in federal court. See *Patsy*, *supra,* at 516.

———————

[9] The history surrounding §1983's enactment also supports this conclusion. See *Felder* v. *Casey*, 487 U. S. 131, 158 (1988),(O'Connor, J., dissenting) ("[T]he original version of §1983 provided that the federal courts would have exclusive jurisdiction of actions arising under it. This fact is conclusive proof that the Congress which enacted §1983 over 100 years ago, could not possibly have meant thereby to alter the operation of state courts in any way .... Abandoning the rule of exclusive federal jurisdiction over §1983 actions, and thus restoring the tradition of concurrent jurisdiction ... did not leave behind a preemptive grin without a statutory cat" (internal quotation marks and citations omitted)).

Therefore, even if every state court closed its doors to §1983 plaintiffs, the plaintiffs could proceed with their claims in the federal forum. See, *e.g.*, *Felder*, *supra,* at 160 (O'Connor, J., dissenting) ("Every plaintiff has the option of proceeding in federal court, and the Wisconsin statute has not the slightest effect on that right"). And because the dismissal of §1983 claims from state court pursuant to NYCLA §24 is for lack of subject-matter jurisdiction, see *supra*, at 8–9, it has no preclusive effect on claims refiled in federal court, see *Allen* v. *McCurry*, 449 U. S. 90, 94, 105 (1980) (requiring "a final judgment on the merits" before a §1983 would be barred in federal court under the doctrine of claim preclusion), and thus does not alter the substance of the federal claim. Any contention that NYCLA §24 conflicts with §1983 therefore would be misplaced.

The Court nevertheless has relied on an expansive brand of "conflict" pre-emption to strike down state-court procedural rules that are perceived to "burde[n] the exercise of the federal right" in state court. *Felder*, 487 U. S., at 141. In such cases, the Court has asked if the state-law rule, when applied "to §1983 actions brought in state courts [is] consistent with the goals of the federal civil rights laws, or does the enforcement of such a requirement instead 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'?" See *id.*, at 138 (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)). There has been no suggestion in this case, however, that NYCLA §24 is a procedural rule that must be satisfied in order to bring the §1983 action in state court. See *supra*, at 8–9; *infra*, at 27; see also *ante*, at 13, n. 9. As explained above, petitioner's claim was not procedurally deficient; the state court simply lacked the power to adjudicate the claim. See *supra*, at 8–9. Thus, the *Felder* line of cases is inapplicable to this case.

But even if there were such a claim made in this case,

the Supremacy Clause supplies this Court with no author-
ity to pre-empt a state procedural law merely because it
"burdens the exercise" of a federal right in state court.
"Under the Supremacy Clause, state law is pre-empted
only by federal law 'made in Pursuance' of the Constitu-
tion, Art. VI, cl. 2—not by extratextual considerations of
the purposes underlying congressional inaction," such as a
desire to ensure that federal law is not burdened by state-
law procedural obligations. *Wyeth*, 555 U. S., at \_\_\_ (slip
op., at 23) (THOMAS, J., concurring in judgment). A sweep-
ing approach to pre-emption based on perceived congres-
sional purposes "leads to the illegitimate—and thus, un-
constitutional—invalidation of state laws." *Id.*, at \_\_ (slip
op., at 24). I cannot agree with the approach employed in
*Felder* "that pre-empts state laws merely because they
'stand as an obstacle to the accomplishment and execution
of the full purposes and objectives' of federal law . . . as
perceived by this Court." 555 U. S., at \_\_\_ (slip op., at 24).

## III

Even accepting the entirety of the Court's precedent in
this area of the law, however, I still could not join the
majority's resolution of this case as it mischaracterizes
and broadens this Court's decisions. The majority con-
cedes not only that NYCLA §24 is jurisdictional, but that
the statute is neutral with respect to federal and state
claims. Nevertheless, it concludes that the statute vio-
lates the Supremacy Clause because it finds that "equality
of treatment does not ensure that a state law will be
deemed a neutral rule of judicial administration and
therefore a valid excuse for refusing to entertain a federal
cause of action." *Ante,* at 8–9. This conclusion is incorrect
in light of Court precedent for several reasons.

## A

The majority mischaracterizes this Court's precedent

when it asserts that jurisdictional neutrality is "the beginning, not the end, of the Supremacy Clause analysis." *Ante*, at 9–10. As explained above, see *supra*, at 10–23, "subject to only one limitation, each State of the Union may establish its own judicature, distribute judicial power among the courts of its choice, [and] define the conditions for the exercise of their jurisdiction and the modes of their proceeding, to the same extent as Congress is empowered to establish a system of inferior federal courts within the limits of federal judicial power." *Brown*, 321 U. S., at 188 (Frankfurter, J., concurring). That "one limitation" is the neutrality principle that the Court has found in the Supremacy Clause. See *id.*, at 189 ("The only limitation upon the freedom of a State to define the jurisdiction of its own courts is that . . . [it] must treat litigants under the Federal act as other litigants are treated" (internal quotation marks omitted)); *Herb* v. *Pitcairn*, 324 U. S. 117, 123 (1945) ("The freedom of the state courts so to decide is, of course, subject to the qualification that the cause of action must not be discriminated against because it is a federal one"). Here, it is conceded that New York has deprived its courts of subject-matter jurisdiction over a particular class of claims on terms that treat federal and state actions equally. See *ante*, at 1–2, 8–10. That is all this Court's precedent requires. See *supra*, at 9, 18–19.

The majority's assertion that jurisdictional neutrality is not the touchstone because "[a] jurisdictional rule cannot be used as a device to undermine federal law, no matter how even-handed it may appear," *ante*, at 9, reflects a misunderstanding of the law. A jurisdictional statute simply deprives the relevant court of the power to decide the case altogether. See 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2713, p. 239 (3d ed. 1998) ("If the court has no jurisdiction, it has no power to enter a judgment on the merits and must dismiss the action"); Restatement (Second) of Judgments §11, p. 108

(1980) (defining subject-matter jurisdiction as a court's "authority to adjudicate the type of controversy involved in the action"). Such a statute necessarily operates without prejudice to the adjudication of the matter in a competent forum. See *supra*, at 14–15. Jurisdictional statutes therefore by definition are incapable of undermining federal law. NYCLA §24 no more undermines §1983 than the amount-in-controversy requirement for federal diversity jurisdiction undermines state law. See 28 U. S. C. §1332. The relevant law (state or federal) remains fully operative in both circumstances. The sole consequence of the jurisdictional barrier is that the law cannot be enforced in one particular judicial forum.[10]

As a result, the majority's focus on New York's reasons for enacting this jurisdictional statute is entirely mis-

———————

[10] If by asserting that state law is not permitted to "undermine federal law," *ante*, at 9, the majority instead is arguing that NYCLA §24 is a procedural rule that too heavily "burdens the exercise of the federal right" in state court, see *Felder*, 487 U. S., at 141, its argument is equally misplaced. First, the majority concedes that NYCLA §24 is not a state procedural rule. See *ante*, at 12, n. 8. Second, applying the reasoning of *Felder* to a jurisdictional statute like NYCLA §24 would overrule all of the Court's decisions upholding state laws that decline jurisdiction over federal claims, and would virtually ensure that in future cases, no state jurisdictional rule will be upheld as constitutional. By simply rendering a federal claim noncognizable in state court, a statute depriving a state court of subject-matter jurisdiction (even under the terms and conditions permitted by this Court's precedent) will always violate *Felder*'s command that a state rule must not undermine the "remedial objectives" of a federal claim, see 487 U. S., at 138. The jurisdictional statute also will unavoidably implicate *Felder*'s concern that a state rule should not inevitably produce a different outcome depending on whether a claim is asserted in state or federal court, see *ibid*. A state jurisdictional statute necessarily will result in a different outcome in state court, where it will cause dismissal of the federal claim, than in federal court, where that claim will be heard. It is for this reason that the Court has been careful to keep its examination of state jurisdictional statutes and state procedural rules in different categories.

placed. See *ante*, at 7–8. The States "remain independent and autonomous within their proper sphere of authority." *Printz* v. *United States*, 521 U. S. 898, 928 (1997). New York has the organic authority, therefore, to tailor the jurisdiction of state courts to meet its policy goals. See *Fay* v. *Noia*, 372 U. S. 391, 466–467 (1963) (Harlan, J., dissenting) ("The right of the State to regulate its own procedures governing the conduct of litigants in its courts, and its interest in supervision of those procedures, stand on the same constitutional plane as its right and interest in framing 'substantive' laws governing other aspects of the conduct of those within its borders").

It may be true that it was "Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages." *Ante*, at 7–8. But Congress has not enforced that judgment by statutorily requiring the States to open their courts to *all* §1983 claims. See n. 8, *supra*. And this Court has "never held that state courts must entertain §1983 suits." *National Private Truck Council, Inc.* v. *Oklahoma Tax Comm'n*, 515 U. S. 582, 587, n. 4 (1995). Our decisions have held only that the States cannot use jurisdictional statutes to discriminate against federal claims. Because NYCLA §24 does not violate this command, any policy-driven reasons for depriving jurisdiction over a "federal claim in addition to an identical state claim," *ante*, at 8, are irrelevant for purposes of the Supremacy Clause.

This Court's decision in *Howlett* is not to the contrary. Despite the majority's assertion, *Howlett* does not stand for the proposition "that a State cannot employ a jurisdictional rule 'to dissociate itself from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source.'" *Ante*, at 6 (quoting *Howlett*, 496 U. S., at 371). As an initial matter, the majority lifts the above quotation—which was merely part of a passage explaining that a "State may not discriminate

against federal causes of action," *id.,* at 372—entirely out of context. *Howlett'*s reiteration of *McKnett'*s neutrality command, which is all the selected quotation reflects, see 496 U. S., at 372–373, offers no refuge to the majority in light of its concession that NYCLA §24 affords "equal treatment" to "federal and state claims." *Ante*, at 8.

*Howlett* instead stands for the unremarkable proposition that States may not add immunity defenses to §1983. See *ante*, at 7, n. 5 (explaining that *Howlett* held that "a Florida school board could [not] assert a state-law immunity defense in a §1983 action brought in state court" because "the 'elements of, and the defenses to, a federal cause of action are defined by federal law'" (quoting 496 U. S., at 375)). A state law is not jurisdictional just because the legislature has "denominated" it as such. *Id.,* at 381. As the majority observes, the State's "invocation of 'jurisdiction'" cannot "trump" the "Supremacy Clause inquiry," *ante*, at 11–12. The majority, therefore, is correct that a state court's decision "to nullify a federal right or cause of action [that it] believe[s] is inconsistent with [its] local policies" cannot evade the Supremacy Clause by hiding behind a jurisdictional label, *ante*, at 6, because "the Supremacy Clause cannot be evaded by formalism," *ante*, at 13. Rather, a state statute must in fact *operate* jurisdictionally: It must deprive the court of the power to hear the claim and it must not preclude relitigation of the action in a proper forum. See *supra*, at 28–29. *Howlett* proved the point by striking down a state-law immunity rule that bore the jurisdictional label but operated as a defense on the merits and provided for the dismissal of the state court action with prejudice. See 496 U. S., at 359; *supra*, at 22–23.

But the majority's axiomatic refrain about jurisdictional labels is entirely unresponsive to the issue before the Court—*i.e.*, whether NYCLA §24 operates jurisdictionally. Unlike the Florida immunity rule in *Howlett*, NYCLA §24

is not a defense to a federal claim and the dismissal it authorizes is without prejudice. See 9 N. Y. 3d 481, 490, 881 N. E. 2d 180, 186 (2007) (explaining that "the Legislature did nothing more than exercise its prerogative to establish the subject matter jurisdiction of state courts" and that "litigants like plaintiff can use the federal courts to pursue section 1983 claims" against correction officers). For this reason, NYCLA §24 is not merely "denominated" as jurisdictional—it actually is jurisdictional. The New York courts, therefore, have not declared a "category" of §1983 claims to be "'frivolous'" or to have "'no merit'" in order to "'relieve congestion'" in the state-court system. See *ante*, at 7–8 (quoting *Howlett, supra*, at 380). These courts have simply recognized that they lack the power to adjudicate this category of claims regardless of their merit.

The majority's failure to grapple with the clear differences between the immunity rule at issue in *Howlett* and NYCLA §24 proves that its decision is untethered from precedent. And more broadly, the majority's failure to account for the important role of claim preclusion in evaluating whether a statute is jurisdictional undermines the important line drawn by this Court's decisions between subject-matter jurisdiction and the merits. See *Marrese* v. *American Academy of Orthopaedic Surgeons*, 470 U. S. 373, 382 (1985) ("With respect to matters that were not decided in the state proceedings . . . claim preclusion generally does not apply where 'the plaintiff was unable to . . . seek a remedy because of the limitations on the subject matter jurisdiction of the courts'" (quoting Restatement (Second) of Judgments §26(1)(c)(1982))); see also *Arbaugh*, 546 U. S., at 514–516; *Steel Co.*, 523 U. S., at 94.

The majority's principal response is that NYCLA §24 "is effectively an immunity statute cloaked in jurisdictional garb." *Ante*, at 12. But this curious rejoinder resurrects an

argument that the majority abandons earlier in its own opinion. See *ante,* at 7, n. 5. The majority needs to choose. Either it should definitively commit to making the impossible case that a statute denying state courts the power to entertain a claim without prejudice to its reassertion in federal court is an immunity defense in disguise, or it should clearly explain why some other aspect of *Howlett* controls the outcome of this case. This Court has required Congress to speak clearly when it intends to "upset the usual constitutional balance of federal and state powers." *Gregory,* 501 U. S., at 460. It should require no less of itself.

At bottom, the majority's warning that upholding New York's law "would permit a State to withhold a forum for the adjudication of any federal cause of action with which it disagreed as long as the policy took the form of a jurisdictional rule" is without any basis in fact. *Ante,* at 13, n. 9. This Court's jurisdictional neutrality command already guards against antifederal discrimination. A decision upholding NYCLA §24, which fully adheres to that rule, would not "circumvent our prior decisions." *Ibid.* It simply would adhere to them.[11]

---

[11] The majority also suggests that allowing jurisdictional neutrality to be the test "would create a blind spot in the Supremacy Clause" because a procedural rule that too heavily burdens a federal cause of action would be struck down as unconstitutional while "a State could express its disagreement with (and even open hostility to) a federal cause of action, declare a desire to thwart its enforcement, and achieve that goal by removing the disfavored category of claims from its courts' jurisdiction." *Ante,* at 12, n. 8. This is incorrect for at least two reasons. First, as explained above, a State may permissibly register its hostility to federal law only by subjecting analogous state-law claims to equally disfavored treatment. See *supra,* at 19–20. Hostility to federal law is thus irrelevant under this Court's precedent—the Supremacy Clause is concerned only with whether there is antifederal discrimination. Second, the majority obscures important differences between procedural rules, like the notice-of-claim rule at issue in *Felder,* and neutral jurisdictional statutes like NYCLA §24. Unlike a neutral

B

The majority also incorrectly concludes that NYCLA §24 is not a neutral jurisdictional statute because it applies to a "narrow class of defendants," *ante*, at 7, and because New York courts "hear the lion's share of all other §1983 actions," *ante*, at 12. A statute's jurisdictional status does not turn on its narrowness or on its breadth. See *Arbaugh, supra*, at 515, n. 11. Rather, as explained above, a statute's jurisdictional status turns on the grounds on which the state-law dismissal rests and the consequences that follow from such rulings. No matter how narrow the majority perceives NYCLA §24 to be, it easily qualifies as jurisdictional under this established standard. Accordingly, it is immaterial that New York has chosen to allow its courts of general jurisdiction to entertain §1983 actions against certain categories of defendants but not others (such as correction officers), or to entertain §1983 actions against particular defendants for only certain types of relief.

Building on its assumption that a statute's jurisdictional status turns on its scope, the majority further holds that "having made the decision to create courts of general jurisdiction that regularly sit to entertain analogous suits,

_____

jurisdictional statute, which merely prevents a state court from entertaining a federal claim, failure to comply with a state procedural rule will result in dismissal of a federal claim with prejudice. See *Felder*, 487 U. S., at 151 (explaining that the State's "outcome-determinative law must give way when a party asserts a federal right in state court"). Contrary to the majority's assertion, therefore, it is not that state courts with "unconstitutionally burdensome procedural rules did not go far enough"—it is instead that they went too far by placing an insurmountable procedural hurdle in the plaintiff's path that led to a judgment against him on the merits. *Ante*, at 12, n. 8. As a result, the Court's assessment of whether a state procedural rule too heavily burdens a federal right does not have any bearing on the Court's continued adherence to the neutrality principle as the sole determinant in evaluating state-law jurisdictional statutes.

New York is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy." *Ante*, at 11. But whether two claims are "analogous" is relevant only for purposes of determining whether a state jurisdictional statute discriminates against federal law. This inquiry necessarily requires an evaluation of the similarities between *federal* and *state* law claims to assess whether state-court jurisdiction is being denied to a federal claim simply because of its federal character.

In contrast, the majority limits its analysis to state-law claims, finding discrimination based solely on the fact that state law provides jurisdiction in state court for claims against state officials who serve in "analogous" roles to the correction officers. See *ante*, at 10. The majority's inquiry is not probative of antifederal discrimination, which is the concern that first led this Court in *McKnett* to find a Supremacy Clause limitation on state-court jurisdictional autonomy. Consequently, there is no support for the majority's assertion that New York's decision to treat police officers differently from correction officers for purposes of civil litigation somehow violates the Constitution. See *ante*, at 10.

Worse still, the majority concludes that §1983 claims for damages against "other state officials" are "sufficiently analogous to petitioner's §1983 claims" to trigger a Supremacy Clause violation. *Ante*, at 10–11, and n. 6. Under this reasoning, if a State grants its trial courts jurisdiction to hear §1983 claims for damages against *any* state official, the State's decision to deny those courts the power to entertain some narrower species of §1983 claims—even on jurisdictionally neutral terms—*a fortiori* violates the Supremacy Clause. The majority's assurance that its holding is applicable only to New York's "unique scheme" thus rings hollow. *Ante*, at 12. The majority is forcing States into an all-or-nothing choice that neither the Constitution nor this Court's decisions require. See *FERC* v.

*Mississippi*, 456 U. S. 742, 774, n. 4 (1982) (Powell, J., concurring in part and dissenting in part) ("It would not be open to us to insist on adjudication in a state court of a federal claim arising beyond the jurisdiction of the local court" (internal quotation marks omitted)).

Indeed, the majority's novel approach breaks the promise that the States still enjoy "'great latitude . . . to establish the structure and jurisdiction of their own courts.'" *Ante*, at 10 (quoting *Howlett*, 496 U. S., at 372). It cannot be that New York has forsaken the right to withdraw a particular class of claims from its courts' purview simply because it has created courts of general jurisdiction that would otherwise have the power to hear suits for damages against correction officers. The Supremacy Clause does not fossilize the jurisdiction of state courts in their original form. Under this Court's precedent, States remain free to alter the structure of their judicial system even if that means certain federal causes of action will no longer be heard in state court, so long as States do so on nondiscriminatory terms. See *Printz*, 521 U. S., at 906, n. 1. (explaining that "the States obviously regulate the 'ordinary jurisdiction' of their courts"); *Johnson* v. *Fankell*, 520 U. S. 911, 922, n. 13 (1997) ("We have made it quite clear that it is a matter for each State to decide how to structure its judicial system"). Today's decision thus represents a dramatic and unwarranted expansion of this Court's precedent.

## IV

"[I]n order to protect the delicate balance of power mandated by the Constitution, the Supremacy Clause must operate only in accordance with its terms." *Wyeth*, 555 U. S., at ___ (slip op., at 3) (THOMAS, J., concurring in judgment). By imposing on state courts a duty to accept subject-matter jurisdiction over federal §1983 actions, the Court has stretched the Supremacy Clause beyond all

reasonable bounds and upended a compromise struck by the Framers in Article III of the Constitution. Furthermore, by declaring unconstitutional even those laws that divest state courts of jurisdiction over federal claims on a non-discriminatory basis, the majority has silently overturned this Court's unbroken line of decisions upholding state statutes that are materially indistinguishable from the New York law under review. And it has transformed a single exception to the rule of state judicial autonomy into a virtually ironclad obligation to entertain federal business. I respectfully dissent.