Zervos v Trump (2019 NY Slip Op 01851)





Zervos v Trump


2019 NY Slip Op 01851


Decided on March 14, 2019


Appellate Division, First Department


Renwick, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 14, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Peter Tom
Angela M. Mazzarelli
Troy K. Webber
Cynthia S. Kern, JJ.


150522/17 7610 

[*1]Summer Zervos, Plaintiff-Respondent,
v
Donald J. Trump, Defendant-Appellant. Law Professors, Amici Curiae.



Defendant appeals from an order of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered March 21, 2018, which denied his motion to dismiss the defamation complaint or in the alternative to stay the action, and denied his special motion to strike the complaint under California's anti-SLAAP statute.




Kasowitz Benson Torres LLP, New York (Marc E. Kasowitz, Christine A. Montenegro and Paul J. Burgo of counsel), for appellant.
Cuti Hecker Wang LLP, New York (Mariann Meier Wang, John Cuti, Eric Hecker, Daniel Mullkoff and Heather Gregorio of counsel), for respondent.
Ropes & Gray LLP, New York (Robert S. Fischler, Patrick J. Reinikainen, Elizabeth Bierut and Nicholas C. Spar of counsel), for amici curiae.



RENWICK, J.P.


This case raises a constitutional issue of first impression: whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end.
Two decades ago, in Clinton v Jones (520 US 681 [1997]), the United States Supreme Court rejected the then-sitting President's attempt to shield himself from alleged unofficial misconduct by relying upon the constitutional protection of the Presidency. Specifically, the Supreme Court found that the Separation of Powers doctrine of the United States Constitution did not afford President Clinton temporary immunity from civil damages litigation, in federal [*2]court, arising out of events that occurred before he took office. The Court determined that a federal court's exercise of its constitutional authority to decide cases and controversies did not encroach upon the exercise of the executive powers of the President.
More than 20 years later, the current sitting President attempts to shield himself from consequences for his alleged unofficial misconduct by relying upon the constitutional protection of the Presidency. We reject defendant President Trump's argument that the Supremacy Clause of the United States Constitution prevents a New York State court - and every other state court in the country - from exercising its authority under its state constitution. Instead, we find that the Supremacy Clause was never intended to deprive a state court of its authority to decide cases and controversies under the state's constitution.
As more fully explained below, the Supremacy Clause provides that federal law supersedes state law with which it conflicts, but it does not provide that the President himself is immune from state law that does not conflict with federal law. Since there is no federal law conflicting with or displacing this defamation action, the Supremacy Clause does not provide a basis for immunizing the President from state court civil damages actions. Moreover, in the absence of a federal law limiting state court jurisdiction, state and federal courts have concurrent jurisdiction. Thus, it follows that the trial court properly exercised jurisdiction over defendant and properly denied his motion to dismiss.
The hypothetical raised by the dissent, in explaining its position, that a state court could potentially exercise direct control over the President by holding him in contempt, should not be the basis for this Court to broadly hold that a state court lacks jurisdiction over defendant at this juncture. Rather, we should not and do not make a present jurisdictional determination based on a hypothetical scenario that is highly unlikely to occur in the context of this lawsuit. In the event that, in the future, the trial court should hold defendant in contempt, the issue of whether the court has jurisdiction over the President to do so can be determined as a discrete issue. Concerns about contempt, however, should not be the underpinning for a conclusion that the Supremacy Clause renders defendant immune from this civil lawsuit while he is serving as President.
Factual and Procedural Background
This defamation lawsuit was commenced by Summer Zervos, a former contestant on the "Apprentice," a reality show starring defendant Donald Trump. Plaintiff alleges that in 2016, when defendant was a Presidential candidate, he wrongly smeared her by claiming that her allegations of sexual misconduct against him were lies.
Specifically, on October 14, 2016, plaintiff held a press conference to recount two separate incidents in which defendant had made unwanted sexual advances towards her. The first incident allegedly occurred when she met with defendant at his New York office in 2007, where he kissed her on the lips upon her arrival, and after stating that he would love to have her work for him, kissed her on the lips again as she was about to leave. The kisses made her feel "very nervous and embarrassed" and "upset."
The second encounter occurred soon thereafter. Ms. Zervos went to meet defendant for dinner at a restaurant in the Beverly Hills Hotel. Instead, she was escorted to his bungalow, where he kissed her "open mouthed," "grabbed her shoulder, again kissing her very aggressively, and placed his hand on her breast." After she pulled back and walked away, defendant took her hand, led her into the bedroom, and when she walked out, turned her around and suggested that they "lay down and watch some telly telly." He embraced her, and after she pushed him away, he "began to press his genitals against her, trying to kiss her again." She "attempt[ed] to make it clear that [she] was not interested" and insisted that she had come to have dinner. They had dinner, which ended abruptly when defendant stated that he needed to go to bed. Later that week, plaintiff, who was seeking a position in the Trump Organization, was offered a job at half the salary that she had been seeking. Plaintiff called defendant and told him that she "was upset, because it felt like she was being penalized for not sleeping with him." Plaintiff concluded her press statement by stating that after hearing the released audiotape and defendant's denials during [*3]the debate, "I felt that I had to speak out about your behavior. You do not have the right to treat women as sexual objects just because you are a star."
The audiotape referred to by plaintiff had been released a week earlier. On October 7, 2016, during the 2016 United States presidential election, the Washington Post published a video and accompanying article about then-presidential candidate Donald Trump and television host Billy Bush having an extremely lewd conversation about women in 2005. Trump and Bush were in a bus on their way to film an episode of Access Hollywood. In the video, defendant described his attempt to seduce a married woman and indicated he might start kissing a woman that he and Bush were about to meet. He added, "I don't even wait. And when you're a star, they let you do it. You can do anything. Grab them by the pussy. You can do anything."
Several hours after plaintiff's press conference, defendant posted on his campaign the following statement: "To be clear, I never met her at a hotel or greeted her inappropriately a decade ago. That is not who I am as a person, and it is not how I've conducted my life." Between October 14, 2016 and October 22, 2016, defendant, on Twitter, at campaign rallies, and at a presidential debate, made additional statements in response to plaintiff's allegations and other women's claims of sexual misconduct, including, "These allegations are 100% false. . . . They are made up, they never happened. . . . It's not hard to find a small handful of people willing to make false smears for personal fame, who knows maybe for financial reasons, political purposes"; "Nothing ever happened with any of these women. Totally made up nonsense to steal the election"; these were "false allegations and outright lies, in an effort to elect Hillary Clinton President. . . . False stories, all made-up. . . . All big lies"; the reports were "totally false," he "didn't know any of these women," and "didn't see these women"; and "Every woman lied when they came forward to hurt my campaign, total fabrication. The events never happened. Never. All of these liars will be sued after the election is over." He also re-tweeted statements by others, including one that had a picture of plaintiff and stated, "This is all yet another hoax."
On January 17, 2017, plaintiff commenced this action against defendant who in November 2016 had been elected President of the United States. Plaintiff alleged that the above statements by defendant were false and defamatory, and that defendant made them "knowing they were false and/or with reckless disregard for their truth or falsity." Plaintiff alleged that the statements about her were "defamatory per se," because "they would tend (and did) injure [her] trade, occupation or business," that "[b]eing branded a liar who came forward only for fame or at the manipulation of the Clinton campaign has been painful and demoralizing," and that as a direct result of those statements, she has suffered "both emotionally and financially." She also alleged that defendant's statements "have been deeply detrimental to [her] reputation, honor and dignity." The complaint seeks an order directing defendant to retract any and all defamatory statements and/or apologize for such statements, as well as an order directing defendant to pay compensatory and punitive damages.
Defendant moved to dismiss the complaint pursuant to CPLR 3211(a) on the basis that the state court had no jurisdiction to entertain a suit against a sitting President. Alternatively, defendant sought a stay, pursuant to CPLR 2201, that would remain in effect for the duration of his presidency. First, defendant argued that, as implied by the United States Supreme Court in Clinton v Jones (520 US 681 [1997], supra), the Supremacy Clause of the United States Constitution prevents a state court from hearing an action, whatever its merit or lack thereof, against a sitting President, because a state court may not exercise "direct control" over or interfere with the President, and that the action should be dismissed without prejudice to plaintiff's refiling after defendant leaves office, or stayed until such time.
Second, defendant argued that the complaint should be dismissed on the merits because plaintiff, who resides and was allegedly injured in California, cannot state a single cause of action for defamation under California law, because the statements at issue "were made during a national political campaign that involved heated public debate in political forums," and that "[s]tatements made in that context are properly viewed by courts as part of the expected fiery rhetoric, hyperbole, and opinion that is squarely protected by the First Amendment."
Defendant further argued that his denials of plaintiff's "accusations cannot constitute defamation as a matter of law," because plaintiff cannot show that each of the purportedly defamatory statements was "of and concerning" her because they make no mention of her, and that plaintiff's complaint fails to adequately plead damages.
Finally, defendant argued that California's "Anti-SLAPP" statute, which protects defamation defendants from "strategic lawsuits against public participation" (lawsuits brought primarily to chill the valid exercise of free speech in connection with a public issue) also bars the action, contending that plaintiff could not satisfy the heightened burden of showing a probability that she will prevail on her claim, and that his motion to strike should be granted.
In opposition, plaintiff first argued that a state court may adjudicate civil claims against a sitting President, where those claims involve unofficial conduct that occurred prior to the President's taking office, at least in the absence of any showing of local prejudice in the state court or that the discovery would involve disclosure of secret information deemed vital to national security. Plaintiff argued that Clinton v Jones did not
suggest otherwise. Plaintiff further argued that there is no basis to stay the action for years on the ground that the proceeding might interfere with the President's official duties.
Second, plaintiff argued that New York law applies to the defamation claim because there is no conflict with California's defamation law, and that the claim is well pleaded, contending that the cited statements charging plaintiff with making false allegations of defendant's sexual misconduct for political purposes or to seek fame and fortune are factual in nature and not opinions or rhetoric, and that there is no immunity for defamation by a political candidate during a campaign. Plaintiff further argued that, even assuming she is a limited purpose public figure, she sufficiently pleaded actual malice by alleging defendant made the statements knowing they were false and/or with reckless disregard for their truth or falsity, and that she adequately pleaded damages.
Finally, plaintiff argued that California's anti-SLAPP statute does not apply to this New York State case because it is procedural, not substantive, and that even if it did apply, the special motion to strike was untimely filed and without merit.
The motion court denied defendant's motion in its entirety. First, the court found that Clinton v Jones, where the Supreme Court required President Clinton to defend against a federal civil rights action that included a state-law defamation claim, "settled that the President of the United States has no immunity and is subject to the laws' for purely private acts" (quoting Clinton at 696). That case, the motion court explained, found that regardless of the outcome, there was no possibility that the decision would curtail the scope of the official powers of the executive branch or involve the risk of misallocation of judicial power, and that the doctrine of Separation of Powers did not mandate a stay of even burdensome private actions against the President, which did not "necessarily rise to the level of constitutionally forbidden impairment of the [e]xecutive's ability to perform its constitutionally mandated functions."
The motion court concluded that the "rule is no different for suits commenced in state court related to the President's unofficial conduct," ruling that "[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility." This is because, the motion court explained, "there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions," and "[t]here is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action." While the court noted that the Supreme Court in Clinton v Jones had pointed out that state court proceedings may warrant a different analysis than those in federal court, the motion court found that the concerns raised by the Supreme Court involved "unlawful state intrusion into federal government operations," concerns that are "nonexistent when only unofficial conduct is in question."
Further, the court concluded that there is no legitimate fear of local prejudice in state [*4]court when the actions under review bear no relationship to federal duties, and that there is "no reason . . . that state courts like their federal counterparts will be either unable to accommodate the President's needs or unfaithful to the tradition . . . of giving the utmost deference to Presidential responsibilities'" (quoting Clinton at 709 [internal quotation marks omitted]). Accordingly, the court also denied the motion for a stay of the action for the same reasons as in Clinton v Jones, finding that important federal responsibilities will be afforded precedence over the prosecution of the lawsuit.
Second, finding that New York law applies and that the California anti-SLAPP provision is procedural and inapplicable, the motion court declined to dismiss the defamation action for failure to state a claim. The court cited Court of Appeals precedent (Davis v Boeheim, 24 NY3d 262 [2014]) in determining that "a defamation action could be maintained against a defendant who called individuals claiming to have been victims of sexual abuse liars and stated that he believed that they were motivated by money to go public," noting that a reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe that his statements of "fact" that the allegations of sexual misconduct were totally false and fabricated for personal gain conveyed that plaintiff was contemptible. The court further found that "in their context, defendant's repeated statements — which were not made through op-ed pieces or letters to the editor but rather were delivered in speeches, debates and through Twitter . . . - cannot be characterized simply as opinion, heated rhetoric or hyperbole," and that the fact that the statements were made in a political campaign does not make them any less actionable.
This appeal ensued. We now affirm for the reasons explained below.
Discussion
We first address the threshold question of whether the Supremacy Clause prevents a New York court from exercising jurisdiction over defendant in this defamation lawsuit.
Defendant essentially argues that the motion court erred in failing to dismiss or stay the action under the Supremacy Clause because the clause makes federal law the "supreme law" of the land, and the Clause is violated when a state court exercises "direct control" over a sitting President, who has principal responsibility to ensure that federal laws are faithfully executed. Defendant submits that such forbidden direct control necessarily occurs where a state court hears an action like this one, that would inevitably involve a court issuing, among others, scheduling and discovery orders that would require a response from the President, such as the production of documents and an appearance at a deposition. As explained below, defendant's arguments fail and he must necessarily revert to the policy arguments made by then-President Clinton and rejected by the United States Supreme Court.
The Supremacy Clause provides, "Th[e] Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const, art VI, cl 2).
Read plainly, the Supremacy Clause confers "supreme" status on federal laws, not on the status of a federal official (see Haywood v Drown, 556 US 729, 751-752 [2009, Thomas, J., dissenting] ["(A) valid federal law is substantively superior to a state law" and the "exclusive function" of the Supremacy Clause "is to disable state laws that are substantively inconsistent with federal law"]). The Supreme Court has interpreted the Clause to affirmatively permit Congress to impose limitations on state sovereignty (see Tafflin v Levitt, 493 US 455, 459 [1990]; see also id. at 470 [Scalia, J., concurring] ["It therefore takes an affirmative act of power under the Supremacy Clause to oust the States of jurisdiction"]); Goodyear Atomic Corp. v Miller, 486 US 174, 180 [1988] ["(A)ctivities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides clear and unambiguous' authorization for such regulation"]). The President may also preempt state law through an executive order (see American Ins. Assn. v Garamendi, 539 US 396, 416 [2003]).
In the jurisdictional context, the Supreme Court has held that "if exclusive jurisdiction [*5][is] neither express nor implied, the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it" (Claflin v Houseman, 93 US 130, 136 [1876]; Tafflin, 493 US at 458, citing Claflin). "So strong is the presumption of concurrency [of federal and state court jurisdiction] that it is defeated only in two narrowly defined circumstances: first, when Congress expressly ousts state courts of jurisdiction and second, [w]hen a state court refuses jurisdiction because of a neutral state rule regarding the administration of the courts" (Haywood, 556 US at 735 [internal quotation marks and citation omitted]).
Defendant's reading of the Supremacy Clause  that it bars a state court from exercising jurisdiction over him because he is the "ultimate repository of the Executive Branch's powers and is required by the Constitution to be always in function'" -— finds no support in the constitutional text or case law. Defendant's interpretation conflicts with the fundamental principle that the United States has a "government of laws and not of men" (Cooper v Aaron, 358 US 1, 23 [1958] [internal quotation marks omitted]). Despite the suggestion in his brief that he is the "embodi[ment of] the Executive Branch," and though he is tasked with significant responsibilities, the President is still a person, and he is not above the law. Supremacy Clause jurisprudence makes clear that an affirmative act is required to divest a state court of jurisdiction and defendant is not exempt from state court jurisdiction solely because of his identity as commander-in-chief (see Clinton v Jones, 520 US at 695 ["(I)mmunities are grounded in nature of the function performed, not the identity of the actor who performed it"] [internal quotation marks omitted]). Therefore, the Supremacy Clause does not provide blanket immunity to the President from having to defend against a civil damages action against him in state court.
Defendant has not demonstrated entitlement to immunity from a state court civil damages lawsuit where his acts are purely unofficial. Analysis of defendant's presidential immunity argument is informed by Nixon v Fitzgerald (457 US 731 [1982]), the first case to present the claim that the President of the United States possesses absolute immunity from civil damages liability, and Clinton v Jones. In Fitzgerald, a discharged Air Force employee brought suit against former President Nixon under two federal statutes and the First Amendment, alleging that Nixon, while acting in his official capacity, improperly dismissed him. The employee had testified before a congressional subcommittee on the cost overruns and unexpected technical difficulties in the design of a certain type of aircraft (id. at 734). After his discharge, Fitzgerald filed a claim alleging that President Nixon, certain White House aides, and other Department of Defense officials discharged him in retaliation for his congressional testimony (id. at 739).
Fitzgerald contended that Nixon could only claim qualified immunity, which only protected the President from certain suits. In contrast, Nixon claimed he was entitled to absolute immunity for his official acts. The Supreme Court agreed with President Nixon, stating that "[i]n view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the outer perimeter' of his official responsibility" (id. at 756). The Supreme Court gave little guidance as to what type of acts were within the "outer perimeter" of the President's official responsibility. The Court simply stated that the President has the "constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force" (id. at 757). This absolute immunity for official conduct is necessary because the President is "an easily identifiable target for [civil] suits" and such vulnerability "could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve" (id. at 753).
Accordingly, the premise underlying presidential immunity (and governmental immunity in general) is that society does not want the government's acts and decisions to be influenced by the fear of future civil liability. Society insists that the President base his decisions on sound policy for the nation, not on individual threats of a lawsuit. In furtherance of this rationale, cabinet members and presidential aides are entitled to qualified immunity to protect the free flow of ideas during communications with the President (Harlow v Fitzgerald, 457 US 800, 810 [1982]; see also Butz v Economou, 438 US 478 [1978]). Judicial recognition of the President's [*6]immunity from civil suit for his official acts protects the nation from a presidential decision based on potential civil liability, which could be significantly different from the decision that is best for the country.
In Clinton v Jones, the Supreme Court was presented with the opportunity to expand upon the doctrine of presidential immunity as set forth in Nixon v Fitzgerald. The Supreme Court, however, rejected the invitation to extend the reasoning of Nixon v Fitzgerald to cases in which a sitting President is sued for civil damages that occurred before he took office. In Clinton v Jones, the plaintiff alleged misconduct by President Clinton, which allegedly took place in 1991 and 1992, before he became President (Clinton v Jones, 520 US at 685-686). The Supreme Court described the alleged misconduct as "unrelated to any of his official duties as President of the United States," having "occurred before he was elected to that office" (id. at 686).
The Supreme Court explained that the rationale for immunizing the President from liability for his official conduct does not apply to unofficial conduct (id. at 694-695). Applying a "functional approach," the Court stated that "an official's absolute immunity should extend only to acts in performance of particular functions of his office" and the President's "effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent" (id. citing Fitzgerald).
In so holding, the Supreme Court weighed conflicting historical evidence. The parties pointed to statements made by various Founding Fathers that reflected differences in their views of the role of the President in American society. Ultimately, however, the Supreme Court credited as "consistent with both the doctrine of Presidential immunity as set forth in Fitzgerald and rejection of the immunity claim in this case" the statement that, "although the President is placed [on] high,' not a single privilege is annexed to his character; far from being above the laws, he is amenable to them in his private character as a citizen, and in his public character by impeachment'" (id. at 696, quoting 2 Jonathan Elliot, Debates on the Federal Constitution at 480 [2d ed. 1863 [statement in favor of the Constitution's adoption by James Wilson, one of the leading framers of the Constitution, who also served as a Supreme Court Justice]).
The Supreme Court also rejected the President's argument that the Separation of Powers doctrine placed limits on the federal judiciary's authority to interfere with the executive branch because the President's role in American society is unique and his duties so important that he must "devote his undivided time and attention to his public duties" (id. at 697). The Court "recognized the unique position in the constitutional scheme'" that the presidency occupies (id. at 698-699, quoting Fitzgerald, 457 US at 749) but noted that the " separation-of-powers doctrine does not bar every exercise of jurisdiction over the President'" (Clinton at 705, quoting Fitzgerald, at 753-754) and does not "require federal courts to stay all private actions against the President until he leaves office" (Clinton, at 705-706). The Court also identified historical instances when the President has complied with judicial orders and proposed various accommodations, such as depositions taken at the White House or via teleconference, that could be made to avoid burdensome impositions on the President (id. at 704-705, 709).
In short, the Supreme Court's decision in Clinton v Jones clearly and unequivocally demonstrates that the Presidency and the President are indeed separable. Hence, the Court in Clinton v Jones effectively recognized that the President is presumptively subject to civil liability for conduct that had taken place in his private capacity. The Supreme Court, however, held that within the exercise of its judicial discretion and power, rather than a constitutionally mandated rule of presidential immunity, a federal court may determine that such presumption has been overcome when the President establishes unusual circumstances that outweigh a plaintiff's legal remedy for constitutionally protected rights (id. at 707-708).[FN1]
To be sure, because Clinton v Jones did not involve a state court action, the Supreme Court declined to resolve whether the President may claim immunity from suit in state court (id. at 691). Instead, it presumed that if the case was being heard in state court, the President would rely on federalism and comity concerns, "as well as the interest in protecting federal officials from possible local prejudice" (id.). In a footnote, the Court also stated:
"Because the Supremacy Clause makes federal law the Supreme Law of the Land,' Art. VI, cl. 2, any direct control by a state court over the President, who has principal responsibility to ensure that those laws are faithfully executed,' Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here (cf. e.g., Hancock v Train, 426 US 167, 178-179 [1976]; Mayo v United States, 319 US 441, 445 [1943])" (Clinton v Jones, 520 US at 691 n 13 [third citation omitted]).
This observation by the Court provides the primary fuel for defendant's arguments and the dissent's conclusion that defendant is immune from suit in state court because a state court "is not part of the Constitution's tripartite system of governance and so has none of the powers of a federal court." However, the cases cited in the footnote above suggest only that the Supreme Court was concerned with a state's exercise of control over the President in a way that would interfere with his execution of federal law (Hancock, 426 US at 167 [holding that the State of Kentucky could not force federal facilities in the State to obtain state permits to operate]; Mayo, 319 US at 441 [holding that a Florida state official could not order the cessation of a federal fertilizer distribution program]; but see Alabama v King & Boozer, 314 US 1 [1941] [holding that the State of Alabama could charge a tax on lumber that a federal government contractor purchased within the state for construction of an army base, where the federal government would ultimately pay the tax]).
Indeed, aside from the forum, plaintiff's case is materially indistinguishable from Clinton v Jones. Plaintiff's state law claims against defendant are based purely on his pre-presidential unofficial conduct. By holding that the President can be sued for civil damages based on his purely unofficial acts, Clinton v Jones implicitly rejected the notion that because the President is "always in function," he cannot be subjected to state court litigation (id. at 695 ["Petitioner's effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent"]). The Supreme Court also considered that "[i]f Congress deems it appropriate to afford the President stronger protection, it may respond with appropriate legislation" (id. at 709; cf. Brett M. Kavanaugh, Separation of Powers During the Forty-Fourth Presidency and Beyond, 93 Minn L Rev 1454, 1460-1461 [2009] ["(I)t would be appropriate for Congress to enact a statute providing that any personal civil suits against presidents . . . be deferred while the President is in office. The result the Supreme Court reached in (Clinton v) Jones . . . . may well have been entirely correct . . . But the Court in (Clinton v) Jones stated that Congress is free to provide a temporary deferral of civil suits while the President is in office"]).
Congress has not passed any law immunizing the President from state court damages lawsuits since Clinton v Jones was decided. Therefore, because Clinton v Jones held that a federal court has jurisdiction over the kind of claim plaintiff now asserts and because there is no federal law limiting a state court from entertaining similar claims, it follows that state courts have concurrent jurisdiction with federal courts over actions against the President based on his purely unofficial acts.
Contrary to defendant's contention, Clinton v Jones did not suggest that its reasoning would not apply to state court actions. It merely identified a potential constitutional concern. Notwithstanding that concern, this Court should not be deterred from holding that a state court [*7]can exercise jurisdiction over the President as a defendant in a civil lawsuit.
Likewise, defendant's contention that the President is always in function and thus not separable from the office of the Presidency does not make him immune from state civil litigation simply because a court has the power to hold a party in contempt. Defendant's contention and dissent's reasoning rest primarily on a hypothetical concern about a state court's authority to hold the President in contempt and concomitantly impose imprisonment. That is not, however, the question before this Court. The issue before this Court is whether a state court has jurisdiction over the President, not whether it can hold him in contempt. We should not "make mere hypothetical adjudications, where there is no presently justiciable controversy" regarding contempt and "where the existence of a controversy is dependent upon the happening of future events" (Prashker v United States Guar. Co., 1 NY2d 584, 592 [1956] [internal quotation marks omitted]).
Defendant's concerns, adopted by the dissent, regarding contempt are also unsupported. In fact, as a practical matter, courts rarely hold litigants in contempt and the requirements for a finding of contempt are quite onerous (see Matter of McCormick v Axelrod, 59 NY2d 574, 583 [1983]). Furthermore, regarding penalties for refusal to comply with discovery demands and notices, CPLR 3126 provides a broad range of sanctions tailored to protect the parties, but which fall short of a finding of contempt [FN2]. To the extent that the President must be involved in discovery, the court can minimize the impact on his ability to carry out his official duties by issuing protective orders to prevent abuse (CPLR 3103)[FN3]. Should the trial court find it necessary to require the President to testify, it could allow him to do so by videotape, as has been the custom in recent proceedings involving sitting Presidents.[FN4]
Ultimately, contrary to defendant and dissent's suggestion, state courts are fully aware that they should not compel the President to take acts or refrain from taking acts in his official capacity or otherwise prevent him from executing the responsibilities of the Presidency. It is likely that holding the President in contempt would be the kind of impermissible "direct control" contemplated by Clinton v Jones and violative of the Supremacy Clause.
However, defendant does not appeal from a contempt order and plaintiff does not argue that defendant should be held in contempt. In fact, in Clinton v Jones, the Supreme Court held that it did not have to rule on the constitutionality of ordering a President to appear at a particular time and place because it assumed, as we must do here, that reasonable accommodations would be made with respect to the President's schedule (520 US at 691-692), and thus the particular issue of whether any hypothetical order would be so onerous as to interfere with the President's [*8]official duties was not relevant to the appeal. We follow the prudent course charted by the Clinton v Jones Court.
Accordingly, where, as here, purely unofficial pre-Presidential conduct is at issue, we find, consistent with Clinton v Jones, that a court does not impede the President's execution of his official duties by the mere exercise of jurisdiction over him.
Since the Supremacy Clause does not deprive a state court of its power and authority to decide this case, we must examine defendant's alternative grounds for the dismissal of the action: whether plaintiff has failed to state a cause of action for defamation and whether the action is barred by California anti-SLAAP law. We find neither argument persuasive.
First, we find that the motion court properly determined that New York's law of defamation applies. Defendant, who cites to both California and New York law in support of his defense, fails to show there is the required "actual conflict" between the law of defamation in California and defamation law in New York. Absent a showing of a discernable difference in the laws of the two states, no choice of law analysis is necessary, and New York law is applicable (see SNS Bank v Citibank, 7 AD3d 352, 354 [1st Dept 2004]). In any event, as plaintiff shows, California defamation 1aw is the same as New York defamation law in all relevant ways.
In determining whether a "reasonable" reader would consider that defendant's statements that plaintiff lied about their encounters connotes fact or nonactionable opinion, there are three relevant factors to be considered holistically: (1) whether the statements have a "precise meaning" that is "readily understood"; (2) whether the statements can be proven true or false; and (3) whether either the context in which the statements were made or the "broader social context and surrounding circumstances [were] such as to signal . . . readers or listeners that what [was] being read or heard [was] likely to be opinion, not fact" (Davis v Boeheim, 24 NY3d at 270 [2014] [internal quotation marks omitted]).
Here, defendant's denial of plaintiff's allegations of sexual misconduct is susceptible of being proven true or false, since he either did or did not engage in the alleged behavior. To be sure, a denial, which is a statement of purported fact and not mere opinion, does not always provide a basis for a defamation claim, even though it implicitly claims that the alleging party is not telling the truth. However, a denial, coupled with the claim that the accuser is or will be proven a liar, impugns a person's character as dishonest or immoral and typically crosses the line from nonactionable general denial to a specific factual statement about another that is reasonably susceptible of defamatory meaning (see McNamee v Clemens, 762 F Supp 2d 584, 601 [ED NY 2011]).
The use of the term liar could be perceived in some cases as no more than rhetorical hyperbole that is a nonactionable personal opinion (see Davis, 24 NY3d at 271, citing Independent Living Aids, Inc. v Maxi-Aids, Inc., 981 F Supp 124, 128 [ED NY 1997]). However, that is not the case here, where, again, defendant used the term in connection with his specific denial of factual allegations against him, which was necessarily a statement by him of his knowledge of the purported facts. Further, although defendant's statement that plaintiff was motivated by financial gain was not accompanied with recitation of the "facts" upon which it was based, and although it did not plainly imply that it was based on undisclosed facts, the statement could be viewed by a reasonable reader as containing the implication that defendant knows certain facts, unknown to his audience, concerning organized political efforts to destroy his campaign, which supports his opinion. Given that, the complaint at the very least includes allegations of "mixed opinion" that are actionable (see Davis, 24 NY3d at 271-73).
Defendant further argues that the statements, are nonactionable given the political context in which he made them. We recognize that in light of the hotly contested 2016 campaign, not to mention the fora in which the statements were made (defendant's Internet posting, campaign literature, rallies, and debates), the average reader would largely expect to hear the vigorous expressions of personal opinion, rather than rigorous and comprehensive presentation of factual matter. However, defendant's flat-out denial of a provable, specific allegation against him concerning his own conduct, accompanied by a claim that the accuser was lying, could not be [*9]viewed even in that context as a rhetorical statement of pure opinion or as "vague, subjective, and lacking in precise meaning" (Jacobus v Trump, 156 AD3d 452, 453 [1st Dept 2017], lv denied 31 NY3d 903 [2018]). Nor is there any support for defendant's claim that such statements when made in the context of a heated political campaign are protected political speech. Indeed, claims for defamation may arise out of acrimonious political battles (see Silsdorf v Levine, 59 NY2d 8 [1983], cert denied 464 US 831 [1983]).
Defendant's argument that some of the alleged defamatory statements are not "of and concerning plaintiff" is also without merit. Even where statements alleged by plaintiff do not refer to her by name, most of the challenged statements could reasonably be considered of and concerning her. Defendant began making the challenged statements immediately after plaintiff gave her press conference and they were all made within eight days thereafter. The "allegations" that defendant's statements attack as false and politically motivated and the "events" the statements claim "never happened" are easily understood as relating to plaintiff's accusations, as well as the accusations by other women who had come forward by that time (see Elias v Rolling Stone, 872 F3d 97, 108 [2d Cir 2017]).
Finally, we find that the motion court correctly declined to apply the California anti-SLAPP statute here, and that even if the motion to strike under that statute were to be considered, it would likely be denied. Plaintiff has established that the defamation claim has the requisite "minimal merit" (Grenier v Taylor, 34 Cal App 4th 471, 480 [2014]).
Accordingly, the order of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered March 21, 2018, which denied defendant's motion to dismiss the defamation complaint or in the alternative to stay the action, and denied his special motion to strike the complaint under California's anti-SLAAP statute, should be affirmed, without costs.
All concur except Tom and Mazzarelli, JJ.
who dissent in part in an Opinion by
Mazzarelli, J.




MAZZARELLI, J. (dissenting in part)


In Clinton v Jones (520 US 681 [1997]), the United States Supreme Court held that separation of powers concerns did not preclude a federal lawsuit against a sitting President of the United States based on unofficial acts allegedly committed by him before he assumed office. The Court expressly cautioned in that decision that different concerns, including the Supremacy Clause of the United States Constitution, might influence the result if such a case were brought against the President in state court. However, the Court did not rule that such a suit could or could not proceed. This matter gives us an opportunity to squarely address the question.
Since the majority accurately relates the facts, which are not in controversy, I need not repeat them here. Further, I agree with the majority's conclusion that plaintiff has stated a claim for defamation and that the action is not barred by California's anti-SLAAP law. Where I depart from the majority is in its conclusion to the question outlined above. As explained below, subjecting the President to a state trial court's jurisdiction imposes upon him a degree of control by the State of New York that interferes with his ability to carry out his constitutional duty of executing the laws of the United States. Since the Supremacy Clause guarantees that any effort by the individual states to annul, minimize, or otherwise interfere with those laws will be struck down, it follows that any effort by a state court to control the President must likewise fail.
As a preliminary matter, I do not accept plaintiff's contention that because defendant did not invoke the Supremacy Clause in unrelated actions in which he or an affiliated entity was sued in the court of a different state for activities not related to his official duties, he cannot invoke it here. Plaintiff has offered no support for the notion that the President can waive the operation of the Supremacy Clause, which is an important underpinning of the Constitution's federalist system.
Turning to the merits, the parties agree that the President enjoys complete immunity from suit as concerns actions he takes in his official capacity. They differ, however, on the impact of Clinton v Jones, which, like this case, was based on allegations involving behavior unrelated to [*10]any official acts [FN1], and which appears to be the only other case addressing whether the President is amenable to suit based on behavior not related to his office. The Supreme Court in that case rejected President Clinton's argument that the separation of powers doctrine afforded him absolute immunity from suit for unofficial acts, notwithstanding the extraordinary demands of his job. Plaintiff posits that Clinton v Jones stands for the proposition that, regardless of the forum, so long as the President is not being asked to defend official actions, there is no danger of judicial encroachment into the executive branch. She highlights the Court's statement that
"[w]hatever the outcome of this case, there is no possibility that the decision will curtail the scope of the official powers of the Executive Branch. The litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power" (520 US at 701).
Plaintiff sees no functional difference between the effect a federal court's supervision of litigation would have over a President's executive power and the effect a state court's would, as long as the subject matter were unrelated to the President's official duties, arguing that "the logic of the Court's analysis was aimed at judicial power generally, not at any unique characteristics of federal judicial power."
In arguing that the holding in Clinton v Jones does not compel the same result in this action, defendant stresses that, contrary to plaintiff's characterization of the "logic" of Clinton, the case was entirely about "the unique characteristics of federal judicial power." He relies on the Supreme Court's statement that
"[i]f this case were being heard in a state forum, instead of advancing a separation of powers argument, petitioner would presumably rely on federalism and comity concerns, as well as the interest in protecting federal officials from possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court" (520 US at 691)."
Footnote 13, inserted after the phrase "federalism and comity concerns" in the quoted material, stated
"Because the Supremacy Clause makes federal law "the supreme Law of the Land," Art. VI, cl. 2, any direct control by a state court over the President, who has principal responsibility to ensure that those laws are "faithfully executed," Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here. Cf., e.g., Hancock v. Train, 426 U.S. 167, 178—179, 96 S.Ct. 2006, 2012—2013, 48 L.Ed.2d 555 (1976); Mayo v. United States, 319 U.S. 441, 445, 63 S.Ct. 1137, 1139—1140, 87 L.Ed. 1504 (1943). See L. Tribe, American Constitutional Law 513 (2d ed.1988) ("[A]bsent explicit congressional consent no state may command federal officials ... to take action in derogation of their ... federal responsibilities")."
Defendant argues that the Supremacy Clause acts as an absolute bar to state courts' authority to exercise jurisdiction over a sitting President, citing McCulloch v Maryland (17 US 316, 436 [1819]), which held that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." He describes the President as being "vested with the entire executive authority," such that to permit a state court to have any degree of control over defendant himself would be tantamount to giving that court control over the entire executive branch of the United States government.
Defendant is correct that, in stressing the Supreme Court's view in Clinton v Jones that the litigation against the President would not unduly interfere with his executive power because it was not related to any official acts, plaintiff glosses over the fact that the Court's analysis was limited to whether the separation of powers doctrine barred the litigation. The separation of powers doctrine precludes one branch of the federal government from performing a function of another branch or significantly impairing another branch's ability to perform its function (520 US at 701). As the Clinton Court emphasized, however, separation of powers " does not bar every exercise of jurisdiction over the President of the United States'" (id. at 705, quoting Nixon v Fitzgerald, 457 US 731, 753-754 [1982]). The Court quoted James Madison in the Federalist No. 47, who wrote that "separation of powers does not mean that the branches ought to have no partial agency in, or no controul over the acts of each other'" (id. at 702). Indeed, as the Clinton Court noted, the federal courts have exerted their control over the Presidency in dramatic ways, such as by issuing holdings sharply limiting the President's exercise of executive authority, citing Youngstown Sheet & Tube Co. v Sawyer (343 US 579 [1952]), in which the Court struck down President Truman's plan to nationalize the country's steel mills. The Court also cited to historical examples of Presidents being ordered to submit to federal judicial process, such as Thomas Jefferson when he was served with a subpoena in the treason trial of Aaron Burr (United States v Burr (25 F Cas 30 [No. 14,692d][CC Va 1807]), and Richard Nixon when he was forced to comply with a subpoena seeking tape recordings made in the Oval Office (United States v Nixon (418 US 683 [1974]). Thus, the Clinton Court concluded, the level of intrusion into the President's duties that would be caused by his having to engage in litigation related to unofficial actions would "pose [] no perceptible risk of misallocation of either judicial power or executive power" (id. at 701).
This, of course, is not a separation of powers case. Indeed, plaintiff fails to address the key hypothetical question posed in footnote 13 of Clinton, which is whether there is a corollary notion that a state court, which is not part of the Constitution's tripartite system of governance and so has none of the powers of a federal court, has leeway to "direct appropriate process to the President himself . . .[and] determine the legality of his unofficial conduct" (520 US at 705). In exclusively relying on the logic of Clinton v Jones, which did not analyze the issue, she offers no independent reason why the Supremacy Clause does not prevent the New York state courts from having jurisdiction over her action. I believe that it is her burden to do so, and that she has failed to carry it.
To be sure, the United States Supreme Court has identified some very limited circumstances where state institutions may take action that impacts the federal government, without violating the Supremacy Clause. Mayo (319 US at 447) and Hancock (426 US at 179-180), the cases cited by the Clinton Court in footnote 13, each alluded to, but distinguished, the same two cases in which a state successfully argued that the Supremacy Clause did not preclude it from enforcing regulations that had an effect on the United States. In Alabama v King & Boozer (314 US 1 [1941]), the Court upheld the ability of Alabama to charge a sales tax on lumber that a government contractor purchased in connection with construction of an army base, over the objection of the federal government, which would ultimately pay the cost of the tax. And in Penn Dairies, Inc., v Milk Control Commn. of Pennsylvania (318 US 261 [1943]), the Court rejected a milk seller's Supremacy Clause argument when it was cited for violating a Pennsylvania law setting a floor on the amount milk purveyors could charge for their product. [*11]The dairy argued that because it was selling to a United States Army encampment, the statutory scheme did not apply. The Court found that it was irrelevant that the price control imposed by the state would result in higher costs for the federal government, since the dairy was not a federal agency (318 US at 269).
As stated by the Court in Hancock, these cases reinforce the notion that "[n]either the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the Federal Government" (426 US at 179). Here, the court's jurisdiction over defendant would go much further than merely "touch[ing] the activities of the Federal Government." As defendant correctly notes, "the President alone is vested with the entire executive authority, and is therefore uniquely required under the Constitution to be always in function,' [such that] he is inseparable from the office he holds." This notion that the President occupies a unique place in the Constitutional structure was endorsed by the Clinton Court, which accepted as true the observations of former Presidents from the beginning of the Republic to the modern era as to the sheer magnitude and incessant press of the job (520 US at 698). The Court additionally pointed to the 25th Amendment to the Constitution, which was adopted to ensure that there was never a moment when the nation was not without a President who is up to the task of discharging that office's responsibilities (id.). The question then becomes whether this all-consuming nature of the Presidency creates a constitutional barrier to defendant's susceptibility to suit in state court.
I believe that it does. A state court's jurisdiction over any person is an exercise of considerable power (see Licci v Lebanese Can. Bank, SAL, 20 NY3d 327, 340 [2012] ["personal jurisdiction is fundamentally about a court's control over the person of the defendant"]). Besides the court's ability to issue a decree by which a defendant must abide (here, if plaintiff prevails, to award a money judgment and order defendant to retract his statements and offer an apology), the court holds the power to direct him to respond to discovery demands, to sit for a deposition, and to appear before it. This power includes formidable enforcement mechanisms, including the ability to hold parties in criminal contempt, and, as a last resort, to imprison them. I recognize that this is a highly unlikely event in this case, as the motion court made clear that it would accommodate the singular nature of defendant's job. However, while the court's need to order the President of the United States before it so he can answer to contempt charges is hypothetical, the even remote possibility of such an event elevates an arm of the state over the federal government to a degree that the Supremacy Clause cannot abide. While I have no reason to doubt that the court would demonstrate extraordinary deference to defendant and no reason to believe that defendant would not cooperate in the litigation, there is no way to be absolutely certain that the court would not at some point have to take steps to protect its own legitimacy.
The majority argues that, in light of the doctrine of concurrent jurisdiction, there is no basis in law for depriving state courts of jurisdiction over the President. The majority further contends that there is no policy reason why the President should be immune from suit in state court for unofficial acts he commits before he takes office. Considering each of those arguments in a vacuum, the majority may very well be right. However, each is unhelpful in terms of determining whether the President may be a defendant in state court. Tafflin v Levitt (493 US 455 [1990]), cited by the majority, dealt with whether state courts have concurrent jurisdiction over civil claims brought under the federal Racketeer Influenced and Corrupt Organizations Act. The Supreme Court held in that case that they do, since state courts had not been divested of jurisdiction over such claims "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests'" (493 US at 460, quoting Gulf Offshore Co. v Mobil Oil Corp., 453 US 473, 478 [1981]). Not at issue was whether the state court's exercise of jurisdiction would interfere with the very ability of the President to execute federal law, which is what defendant is arguing.
Nor do I (nor does defendant, for that matter) take any issue with the concept that, focusing on the acts themselves, the President is not immune from suit in state court for unofficial acts. Again, however, in holding that there is no immunity for the President's [*12]unofficial acts, the Supreme Court in Clinton v Jones merely distinguished unofficial acts from the official acts at issue in Nixon v Fitzgerald (457 US 731 [1982], supra). Citing the rationale for the immunity found in Fitzgerald, which was " to forestall an atmosphere of intimidation that would conflict with [public officials'] resolve to perform their designated functions in a principled fashion'" (Clinton, 520 US at 693, quoting Ferri v Ackerman, 444 US 193, 204 [1979]), the Court held that any immunity that stemmed not from presidential functions but from presidential identity was not justified. Again because Clinton was litigated in federal court, the impact of the Supremacy Clause was not relevant. I disagree with the majority that the Clinton Court's holding that the President's identity alone confers on him no special cloak of immunity when he is sued is an "implicit reject[ion of] the notion that because the President is always in function,' he cannot be subjected to state court litigation." Had the Supreme Court meant to imply any such thing it would have had no reason to suggest in footnote 13 that the Supremacy Clause might demand a different result.
The ultimate proof of the irrelevancy of these arguments is that the majority, along with the amici, ultimately agrees with defendant's position, stating that "[i]t is likely that holding the President in contempt would be the kind of impermissible direct control' contemplated by Clinton v Jones and violative of the Supremacy Clause." However, the majority minimizes the possibility that the court would have to exercise its contempt power, and is not at all concerned about this sword of Damocles hanging over the President's head. It is instead content to allow the litigation to proceed until such time as a constitutional crisis is at hand. In my view, this is too narrow an approach. It is not the act of holding the President in contempt that would trigger a Supremacy Clause violation, but the very power to do so once personal jurisdiction is conferred over the President. It is at that point that the court unquestionably has "direct control" over the President, that is, the immediate and ever-present power to issue an order requiring him to take some action, as mundane as directing him to produce discovery or as consequential as mandating his appearance in court on a date certain. For this reason, the majority's suggestion that the court could employ "reasonable accommodations" designed to alleviate the burden on the President is irrelevant. That there is any burden to be managed is the problem. Furthermore, the Clinton Court's discussion of how the litigation involving President Clinton could be managed so as to accommodate his schedule came after it had already determined that he was amenable to suit in federal court, and also after it noted that the analysis might be very different in state court.
The amici argue that the sheer happenstance of a President being sued in state court, rather than federal court, should not be the factor that determines whether the President should have to answer to charges related to his unofficial duties. We do not view this as a conundrum. Indeed, King & Boozer and Penn Dairies turned on the fact that an intermediary prevented a state's regulatory scheme from working directly against the federal government, thus implicating the Supremacy Clause, even though the regulatory scheme ultimately impacted the United States. Accordingly, I do not see this argument as particularly compelling.
Because of the concerns addressed above, the President should not be forced to defend this lawsuit while he is in office. Therefore, in my view the action should be stayed until such time as defendant no longer occupies the office of President of the United States (CPLR 2201).
Order, Supreme Court, New York County (Jennifer G. Schecter, J.), entered March 21, 2018, affirmed, without costs.
Opinion by Renwick, J.P. All concur except Tom and Mazzarelli, JJ. who dissent in part in an Opinion by Mazzarelli, J.
Renwick, J.P., Tom, Mazzarelli, Webber, Kern, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 14, 2019
CLERK



Footnotes

Footnote 1: President Clinton did not show at the federal district court level that the public interest outweighed the plaintiff Jones's right to a legal remedy for constitutional violations (see Clinton v Jones, 520 US at 707-708).

Footnote 2: Like federal court judges (see Fed R Civ P 37[b][2]; see e.g. Southern New England Tel. Co. v Global NAPs Inc., 624 F3d 123, 149 [2d Cir 2010]), state court judges have wide latitude in imposing sanctions. 

Footnote 3: Courts have held that the President need only testify on matters for which no other source is available (see e.g. United States v North, 713 F Supp 1448, 1449 [D DC 1989]; United States v Mitchell, 385 F Supp 1190, 1193 [D DC 1974]).

Footnote 4: See e.g. United States v Branscum, No. LRP-CR-96-49 (ED Ark June 7, 1996) (Clinton); United States v McDougal, 934 F Supp 296, 298 (ED Ark 1996) (Clinton); United States v Poindexter, 732 F Supp 142, 160 (DDC 1990) (Ronald Reagan); 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 7.1(b), at 575 (2d ed. 1992) (Jimmy Carter) (citing several instances); United States v Fromme, 405 F Supp 578, 583 (ED Cal 1975) (Gerald Ford).

Footnote 1: The case arose out of allegations that when he was Governor of the state of Arkansas, President Clinton made unwanted sexual advances toward Paula Jones, a state employee, and then retaliated against her when she spurned those advances (520 US at 685).